Gregory Richardson, Esq, SB #177233
Law Offices of Gregory Richardson, Esq.
3380 La Sierra Ave., Suite 104-640
Riverside, California 92503
Tel: (951) 850-2052

Attorney for Plaintiffs MARK FULTON, dba as
INTEGRITY AUTOMATED SOLUTIONS

## UNITED STATES FEDERAL DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK FULTON, dba as INTEGRITY AUTOMATED SOLUTIONS, <br><br> Plaintiff, <br><br> vs. <br><br> KEITH VOYSEY, Chief Technology Officer, GENEA ENERGY PARTNERS, INC., a California Corporation, , DAVID BALKIN, position unknown, CHRIS TAYLOR, position unknown, and DOES 1 through 50, inclusive, <br><br> Defendants | Case No.:  8:15-cv-00978-CJC-AGR <br><br> **SECOND AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY JUDGMENT OF PATENT INVALIDITY AND UNENFORCEABILITY** <br><br> 1. **CONVERSION;** <br> 2. **TRESPASS TO CHATTELS;** <br> 3. **IMPLIED CONTRACT AND QUANTUM MERUIT** <br> 4. **INTENTIONAL MISREPRESENTATHION;** <br> 5. **FRAUDULENT MISREPRESENTATHION;** <br> 6. **INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONSHIPS;** <br> 7. **NEGLIGENT INTERFERENCE WITH ECONOMIC RELATIONSHIPS;** <br> 8. **TRADE LIBEL;** <br> 9. **UNFAIR COMPETITION California** <br> 10. **Business & Professions Code § 17200.** <br> 11. **BUSINESS DEFAMATION** <br> 12. **DECLARATORY RELIEF OF PATENT INVALIDITY (Counts 11 through 17)** <br><br> **DEMAND FOR A JURY TRIAL** |

## Table of Contents

I.       JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  A. Federal Question Jurisdiction Under 35 U.S.C. § 1 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

  B. Supplement Federal Jurisdiction Under 28 U.S.C. § 1367. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  C. Personal Jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  D. Venue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II. INTRODUCTION:  PATENTEES MUST CONDUCT AN ADEQUATE CLAIMS INFRINGEMENT ANALYSIS, AND MUST ALSO INCLUDE A DESCRIPTION OF INFRINGING CONDUCT, BEFORE SENDING A CEASE AND DESIST LETTER TO SUSPECTED INFRINGERS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.       THE PARTIES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  A.     Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

  B.     Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

IV. BUSINESS OF THE PARTIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

  A.     GENEA Energy Partners, Inc.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

  B.     Mark Fulton And Integrity Automated Solutions [IAS]. . . . . . . . . . . . . . . . . . . . . . . 12

  D. Business Plans for WSA and IAS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

V. EVENT SYNOPSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

  A.     GENEA'S '245 Patent Issued by USPTO. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

  B.     GENEA Knew the WSA Technology From Two Prior Inspections of WSA. . . . . . . . . 16

  C.     Plaintiffs Asked GENEA To Explain Its Allegations of Patent Infringement and Wrongful Impact on Intellectual Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

  D.     GENEA Sent a Cease and Desist Letter Knowing That WSA Did Not Infringe On the '245 Patent. . . . . . . . . 18

  E.     GENEA's Refusal To Describe Any Infringing Conduct Forced FULTON to Abandon WSA. . . . . . . . . . . . . . 19

  F.     GENEA Failed To Describe Infringing Conduct By WSA and Refused to Provide Any Information on its Allegations of Infringement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

  G.     GENEA's Failed To Conduct a Claims Infringement Analysis Before Sending Its Cease and Desist Letter. . . . . . 21

  H.     GENEA Counsel John Guist Failed to Explain Allegations of Infringement. . . . . . . . . . . . . . . . . . . . . . . . . 21

VI. THE FEDERAL ACTION AND GENEA'S FAILURE TO WITHDRAW ITS ALLEGATIONS OF PATENT INFRINGEMENT AND WRONGFUL IMPACT ON ITS INTELLECTUAL PROPERTY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  A.     First Action For Declaratory Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  B.     GENEA's Third Inspection of WSA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

  C.     GENEA Offered a Covenant to Not Sue For Infringing the '245 Patent. . . . . . . . . . . . . . . . . . . . . . . . . 25

  D.     GENEA's Incomplete Covenant-To-Not-Sue Does Not Cover Allegations of Wrongful Impact on GENEA's Intellectual Property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

  E.     GENEA Refused To Withdraw Its Cease and Desist Letter Despite Admitting That WSA Does Not Infringe Upon the '245 Patent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

VII. VIOLATIONS ALLEGED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

  COUNT 1 -- Conversion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

  COUNT 2 -- Trespass To Chattels  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

  COUNT 3 -- Implied Contract And Quantum Meruit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

  COUNT 4 -- Intentional Misrepresentation And Deceit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

  COUNT 5 -- Fraudulent Misrepresentation Regarding Claims Of Patent Infringement and Wrongful Impact on GENEA's IP. 38

  COUNT 6 -- Intentional Interference With Prospective Economic Advantage . . . . . . . . . . . . . . . . . . . . 43

  COUNT 7 -- Negligent Interference With Existing And Prospective Economic Relations . . . . . . . . . . . . . 47

  COUNT 8 --Unfair Competition Under California Business And Professions Code § 17200. . . . . . . . . . . . . 50

  COUNT 9 -- Trade Libel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

  COUNT 10 -- Business Defamation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

  COUNT 11 -- Declaratory Judgment of Non-Infringement on the '245 Patent. . . . . . . . . . . . . . . . . . . . 62

  COUNT 12 -- Declaratory Judgment That the Claims of GENEA's '245 Patent Are Not Patentable Under 35 U.S.C. 101 Because They Contain Matter Not Eligible For Patent Protection. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

  COUNT 13 -- Declaratory Judgment That the Claims of GENEA's '245 Patent Are Not Patentable Under 35 U.S.C. 102 Because They Constitute Prior Art and Lack Novelty. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

  COUNT 14 -- Declaratory Judgment That the Claims of GENEA's '245 Patent Are Not Patentable Under 35 U.S.C. 103 Because They Are Obvious. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

  COUNT 15 -- Declaratory Judgment That the Claims of GENEA's '245 Patent Contain Subject Matter That is Not Patentable Under 35 U.S.C. 112(a) Because of a Lack of Enablement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**COUNT 16 -- Declaratory Judgment That the Claims of GENEA's '245 Patent Are Invalid and Unenforceable Due to GENEA's Failure to Disclose WSA As Prior Art in its Application at the USPTO.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**COUNT 17 -- Declaratory Judgment of Non-Infringement on GENEA's Other Intellectual Property.** . . . . . . . . . . . . . . . . . 69

**PRAYER FOR RELIEF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Plaintiff MARK FULTON, dba INTEGRITY AUTOMATED SOLUTIONS [FULTON] brings this SECOND AMENDED COMPLAINT [SAC] for a determination of patent invalidity, California State Law claims, and further relief for declaratory judgment of patent invalidity and unenforceability against KEITH VOYSEY [VOYSEY], Chief Technology Officer of Genea Energy Partners, Inc., Genea Entergy Partners, Inc. [GENEA or Genea], a California Corporation, DAVID BALKIN [BALKIN], position unknown, and CHRIS TAYLOR [TAYLOR], position unknown.

This SAC contains facts and law not considered in Plaintiff's first federal actions, as presented and discussed below.  Plaintiff alleges the following based on information and belief:

# I.    JURISDICTION AND VENUE

## A. Federal Question Jurisdiction Under 35 U.S.C. § 1 *et seq*.

1)    The subject of this action is GENEA's patent, United States Patent No. 7,774,245 ['245 Patent].

2)    This is an action for declaratory judgment of invalidity and non-infringement by Plaintiff FULTON of the claims of GENEA's '245 Patent arising under the United States Patent Laws, 35 **U.S.C.** § 1 *et seq.*

3)    Federal Question jurisdiction is proper in this civil action because FULTON's claims of patent invalidity arise under the Patent Laws of the United States, 28 **U.S.C.** §1338(a) and the **America Invents Act** [**AIA**], Pub. L. No. 112-29.

4)    This civil action also invokes the **Declaratory Judgment Act**, 28 **U.S.C.** §§ 2201 & 2202 to seek a declaration of non-infringement by the FULTON on any of Genea's intellectual property including, but not limited to, other patents, trademarks, copyrights and trade secrets.

5)    There is an actual controversy between FULTON and GENEA relating to GENEA's '245 Patent and its intellectual property, in that GENEA threatened legal action against FULTON for infringement of GENEA's '245 Patent and other intellectual property

[GENEA's IP or IP] through the WEBSMARTAIR technology platform [WSA].  Although GENEA issued a covenant to not sue FULTON for infringement of the '245 Patent for present versions of WSA, nonetheless, FULTON thereafter continued to suffer irreparable harm to his business and continues to suffer such harm after GENEA refused to withdraw its C&D Letter.

6)    FULTON maintains that as a direct and proximate results of GENEA's failure to either explain its allegations of infringement or withdraw its C&D Letter, he suffered and continues to suffer irreparable harm to his business based on WSA, whereas GENEA asserts that its mere covenant to not sue FULTON for infringing on its '245 Patent absolves it of responsibility for sending a cease and desist letter [C&D Letter] without performing or providing an adequate claims infringement analysis.

7)     This Federal Court has exclusive original subject jurisdiction over Plaintiff's claims of patent invalidity and unenforceability pursuant to federal question jurisdiction, 28 **U.S.C.** §§ 1331, 1338(a), the Declaratory Judgment Act, 28 **U.S.C.** § 2201-02, and the Patent Laws of the United States, 35 **U.S.C.** §§ 1 *et seq.*

## B. Supplement Federal Jurisdiction Under 28 U.S.C. § 1367.

8)    This Federal Court has supplement jurisdiction over Plaintiff's California State law claims pursuant to 28 **U.S.C.** § 1367 because said claims are so related to claims of patent ineligibility, invalidity, and unenforceability that they form part of the same case or controversy under Article III of the United States Constitution.

9)    California State courts cannot exercise any "jurisdiction over any claim for relief arising from any Act of Congress relating to patents, plant variety protection, or copyrights." 28 **U.S.C.** §1338(a).

## C. Personal Jurisdiction.

10)    This court has personal jurisdiction over Defendants VOYSEY, BALKIN, TAYLOR, and GENEA because each Defendant resides in or does business or has minimal contacts with this Judicial District.

**D**. **Venue.**

11)   Venue is proper in this judicial district pursuant to 28 **U.S.C.** §§ 1391(b) & (c) because Defendants VOYSEY, BALKIN, TAYLOR, and GENEA reside, do business or have their principle place of business in this Judicial District.

## II. INTRODUCTION:  PATENTEES MUST CONDUCT AN ADEQUATE CLAIMS INFRINGEMENT ANALYSIS, AND MUST ALSO INCLUDE A DESCRIPTION OF INFRINGING CONDUCT, BEFORE SENDING A CEASE AND DESIST LETTER TO SUSPECTED INFRINGERS.

12)   The principles at stake in this litigation implicate how a patentee should deal with a suspected infringer.  Since GENEA failed to include any description of any infringing activity in its cease and desist letter [C&D Letter] to Plaintiff, GENEA exhibited bad faith.  And because even a good faith belief in the invalidity of a patent is not a defense against willful infringement, FULTON had to act by conducting his own investigation of infringement.  So FULTON inquired of GENEA about the basis of its allegations of infringement.  Under the circumstances, clearly FULTON could not merely deny infringement.  So that GENEA ultimate refusals and failures to provide any form of a claims infringement analysis demonstrates both objective and subjective bad faith.

13)   Basically, GENEA either did not conduct a claims infringement analysis or it performed an inadequate one before sending its C&D Letter.  In either case, it already had sufficient information to know whether WSA infringed on the '245 Patent through two inspections, *i.e.* a secret inspection conducted in 2008 [SECRET INSPECTION] and an internet inspection [INTERNET INSPECTION] conducted around 2010.  In addition, all of the information needed to learn the functionality and workings of the WSA technology were freely available on the WEB (currently www.matter-systems.com).  Based on what GENEA knew or should have known from its prior inspections and the information freely available from the Internet, GENEA could not have had a reasonable basis for believing that it could prevail in any patent infringement lawsuit.

14)     What patentees should not do, as GENEA did, is send a cease and desist letter without comparing the claims of the patent, *i.e.* the '245 Patent, along with the functionality and features of the suspected infringing product, *i.e.* WSA.  The absence of such a comparison in the C&D Letter indicates that GENEA did not have sufficient infringement information to provide details of infringement.  The cause of not having sufficient infringement information was failing to perform an adequate claims infringement analysis.  A reasonable jury could conclude that GENEA's ultimate failure to provide any form of claims infringement analysis demonstrates a lack of good faith and informed comparison of the claims of the '245 Patent and the features of the WSA technology.  A reasonable jury could also conclude that GENEA filed to perform reasonable preparation, and that this lack of preparation gave no reasonably objective assurance to GENEA that it could prevail in any infringement lawsuit.

15)     Nor should patentees send a C&D Letter threatening litigation if it has no intent to sue for infringement.  Based on the facts that GENEA failed to assert claims for infringement at least twice when it had the opportunity to do so, a reasonable jury could conclude that GENEA never intended to sue for infringement.  Sending a letter threatening litigation with no intention of following through could be construed by a reasonable fact finder as a lack of good faith in sending the letter.

16)     Probably expecting compliance with its demands to stop using and developing WSA technology, and instead facing litigation against a non-compliant competitor who refused to acquiesce to GENEA's unilateral demands, GENEA then demanded an inspection of WSA through discovery.  However, since GENEA never before requested an inspection of WSA before, even during extensive pre-litigation negotiations, a reasonable jury could conclude that GENEA had all of the information it believed necessary to allege infringement and that its inspection request was just a sham to cover up its failure to perform a claims infringement analysis.

17)     In the end, there is no evidence that GENEA ever compared the claims of the '245 Patent and the features of WSA technology, even after its third inspection of WSA during

discovery in the First Federal Action.  In addition, the lack of any description of any infringing conduct by WSA in the C&D Letter is adequate evidence to infer that GENEA conducted no pre-letter investigation comparing the claims of the '245 Patent with WSA technology.  There is little or no evidence that a reasonably qualified software engineer evaluated a comparison of the claims in the '245 Patent with the functionality of the WSA technology.  GENEA claims that it performed a careful investigation and analysis, but there is little or no evidence that its patent counsel did so.  A reasonable jury could conclude that GENEA's failures to produce any claims infringement analysis conducted before sending its C&D Letter was the result of bad faith.

18)    And from GENEA's refusals and failures to provide any claims infringement analysis during litigation, a reasonable jury could conclude that none was performed before sending its letter and that GENEA sent its C&D Letter maliciously.

19)    During prior litigation, GENEA was faced with a golden opportunity to sue for infringement on its '245 Patent--but curiously, it did not.  Instead of withdrawing its C&D Letter when FULTON noted to John Guist, GENEA's then patent counsel, that WSA could not possibly infringe on GENEA's '245 Patent since WSA did not use metered energy usage data, GENEA stubbornly refused to reconsider its allegations of infringement.  Incorrectly, GENEA stated that it was FULTON's burden of proof to prove non-infringement, whereas as a matter of law the patentee always bears the burden of proving infringement.  The burden of proof does not shift from the defendant patentee in an action for declaratory relief.  A reasonable inference could be made by a jury that such obstinance constitutes abuse of process and subject bad faith.

20)    In its original answer in the FIRST FEDERAL ACTION, GENEA refused or failed to allege any counter-claims that WSA infringed on its '245 Patent, which under the **Federal Rules of Civil Procedure** are compulsory and waived if not made then.  From this first reluctance to assert claims of infringement, a reasonable jury could conclude that GENEA

never intended to sue for infringement and that its threats of litigation in the C&D Letter were mere bad faith imitations of overbearing intimidation.

21)   Subsequently, GENEA had a second chance to assert claims of infringement, but again it decided not to.  In the prior litigation, GENEA obtained leave from the court to file an amended answer in order to assert counter-claims for infringement on the '245 Patent.  By this time, FULTON had expended much energy in seeking information on infringement from GENEA, to no avail.  By then he had also spent considerable resources on litigation to somehow resolve GENEA's unsubstantiated claims of infringement.  But then, in the event, GENEA decided to not file any amended answer at all, thus causing much waste of FULTON's efforts and resources.  From this second failure to assert claims of infringement, a reasonable jury could conclude that GENEA never, ever intended to sue FULTON for patent infringement and that GENEA's threats of litigation in its C&D Letter were maliciously motivated in bad faith.

22)   Instead of counter-claiming for infringement, which would have forced GENEA to eventually produce a claims infringement analysis and engage in discovery which in all probability would have revealed that it conducted none before sending its C&D Letter, GENEA issued a covenant to not sue in order to avoid a determination that its '245 Patent was invalid and unenforceable.  While GENEA could argue that it issued this covenant in order to avoid further litigation, a reasonable jury could instead conclude that GENEA had waited until the very last minute to make its promise merely in order to cause the most financial hardship and business turmoil on FULTON.

23)   But there are yet other reasons that motivated GENEA to terminate the prior litigation without any review on the merits, *i.e.* to obscure its own inequitable conduct and avoid a determination of the invalidity of the '245 Patent on the merits.  While GENEA could argue that it did not have sufficient information to actually allege infringement its original answer and that it therefore needed to inspect WSA before doing so, the evidence of its prior

inspections of WSA indicates that it did have sufficient information, or so a reasonable jury could so conclude.

24)    And the fact that GENEA did not cite WSA as prior art in its application for the '245 Patent could be construed by a reasonable jury as an inequitable attempt by GENEA to hide the WSA technology, which renders the claims of GENEA's '245 Patent obvious, from the United States Patent and Trademark Office [USPTO].  Factual and legal research subsequent to the First Federal Action has revealed facts and circumstances that merit a determination of the validity of the '245 Patent on its merits.

25)    Due to GENEA's refusal to provide a claims infringement analysis to FULTON, FULTON has been forced to shut down his business based on WSA.  But FULTON cannot just wait things out because of the overhanging threat of ruinous liability for willful infringement, especially since even a good faith belief in the invalidity of a patent is no defense to willful infringement.  So FULTON asks GENEA to explain their allegations of infringement and wrongful impact on GENEA's IP.  GENEA does not respond and refuses to provide any information regarding alleged infringement.  A reasonable jury could conclude that GENEA suppressed infringement information in bad faith.

26)    GENEA then misleads FULTON by promising to provide a claims infringement analysis, but then fails to produce any.  A reasonable jury could infer from this that GENEA had fraudulent intent by promising to produce, but then failing to deliver, information on infringement.

27)    FULTON had developed a business managing energy consumption in commercial buildings using the WSA technology platform.  But now FULTON cannot use the WSA platform because of the lingering effects of GENEA's C&D Letter which made false and unsubstantiated allegations of infringement on the '245 Patent and wrongful impact on GENEA's IP.

28)    FULTON's customers reasonably decided to not buy into litigation.  GENEA's actions are the epitome of what a patent troll does, which is merely collect patents and

royalties without actually making anything or developing any legitimate business.  In fact, GENEA does not appear to be even using the invention described in the claims of its '245 Patent at all.  At least, from the removal of all discussion of patents from its Website, including no mention of the '245 Patent at all, a reasonable jury could conclude that GENEA never used or implemented its own patent.

29)    In sum, GENEA obtained its '245 Patent only because it failed to cite WSA as prior art in its patent application at the USPTO.  A reasonable examiner would want to know of WSA as a prior art reference for the claims of the '245 Patent because seeing the WSA technology would make the claims of the '245 Patent obvious.  A reasonable jury could conclude from this failure to cite known prior art that GENEA succeeded in committing fraud on the USPTO.

30)    In conclusion, <u>GENEA's only use of its patent at issue here is to shut down small competitors such as Plaintiff FULTON</u>.

## III.    THE PARTIES
### A. Plaintiffs

31)    Plaintiff FULTON is a California resident with his principal place of business at 2500 E. Imperial Highway, #201-313, Brea, California.  FULTON is in the building management business and sells systems using WSA.

### B. Defendants

32)    Defendant GENEA is a California Corporation with its principle place of business at 23691 Del Rio, Yorba Linda, County of Orange, California.

33)    Defendant VOYSEY is the Chief Technology Offer of GENEA and named inventor of the '245 Patent.  GENEA employs more than 100 people and has revenues exceeding $8–10 million annually.  VOYSEY claims to be the CEO of Genea.  He sold interests in GENEA and valued these interests based obtaining and enforcing patents in the energy management field.  VOYSEY seeks to demonstrate the enforceability of his patents in order to justify the

valuation of his companies.  Defendants BALKIN and TAYLOR work at Genea and were CC'd in GENEA's C & D Letter.

34)     The true names and capacities of the Defendants DOES 1 through 50, whether individual, corporate, associate or otherwise, are unknown to Plaintiff at the time of filing this Complaint and Plaintiff, therefore, sues said Defendants by such fictitious names and will ask leave of Court to amend this Complaint to show their true names or capacities when the same have been ascertained.  Plaintiff is informed and believes, and thereupon alleges, that each of the DOE Defendants is, in some manner, responsible for the events and happenings herein set forth and proximately caused injury and damages to the Plaintiff as herein alleged.

## IV. BUSINESS OF THE PARTIES.
### A.  GENEA Energy Partners, Inc.

35)     Competitors in the marketplace where GENEA and FULTON do business owe duties to each other to not make unsupported or unjustified allegations of impact or infringement on their intellectual property.  Once allegations of patent infringement are made, the accused infringer must take steps to avoid willful infringement.  GENEA violated this duty by making false allegations that FULTON and WSA infringed on GENEA's '245 Patent.  However, GENEA's C&D Letter failed to include any description of infringing conduct.  A reasonable jury could conclude from this that GENEA was either careless or reckless.

36)     Without any information which he could use to modify WSA systems in order to avoid willful infringement, FULTON's business based on WSA continued to decline even after GENEA promised in December 2013 to not sue for infringement of the '245 Patent for present versions of WSA.

37)     FULTON and GENEA compete domestically and internationally in building management.  GENEA has advertised on its website that several patents, including the '245 Patent.  Because of the results in the first phase of this litigation in Federal Court, GENEA no longer advertises its patents on its website.

### B.  Mark Fulton And Integrity Automated Solutions [IAS].

37)    WSA technology consists of a web and PC based software application installed on a computer that allows tenants to order air conditioning and lighting serviced in computer controlled buildings.  The software generates an invoice for periods of requested service that are not covered by the lease hours.  WSA does not use metered energy usage data.

38)    During this time FULTON's WSA-based business growth has declined substantially because of the uncertainty of the threat of a lawsuit from Genea and their claims of patent infringement.  By stopping further development of WSA, FULTON took the only <u>reasonable</u> step to avoid potentially devastating litigation and/or willful infringement.

39)    FULTON is the owner and general manager of Integrity Automated Solutions [IAS], a growing company which he founded in 2004 and where he has full profit-loss responsibility. IAS has 21 employees in the following departments:  Building Automation, Electrical Construction and Installation, and Heating Ventilation and Air Conditioning (HVAC).  IAS has grown over the past eight (8) years to 2–½ million in annual sales.  Annual profits are approximately 12–15% percent of revenue.

40)    IAS has developed a strong niche in the local Los Angeles market by offering non-proprietary systems for building automation systems.  Typically, systems for managing energy usage in commercial buildings are first customized for one location and then adapted for other specific location.  These systems are installed in a wide range of buildings, from a single building sites to multi-tower office complexes.  Traditionally is was difficult or impossible to take one system installed at one location and move it to another without substantially changing it due to the need for detailed customization.

41)    IAS has been installing an off-the-shelf system called WSA for more than five (5) years.  IAS installed WSA in over 25 locations in several states and countries.  IAS devoted over 2,000–2,500 man-hours during this time selling and promoting WSA.  After recognizing the trend in the industry towards more "open" standardized applications, IAS achieved an industry leading position starting in 2010 in the growing trend towards off-the-shelf solutions. During a 3 year period IAS installed systems in four (4) of the largest high rise buildings in

downtown Los Angeles:  AON Tower (707 Wilshire), Figueroa Tower (777 Figueroa), 1 California Plaza 300 South Grand, and 800 West 6th Street.

42)   IAS was an innovator in seeking to sell software-based energy management systems for commercial buildings through distributors on the internet.  IAS has developed a stellar reputation for providing the low cost, open protocol solutions for their customers with excellent follow up service and support.  Starting in January, 2012, after building a successful and consistent source of revenue and profits for IAS based on WSA, IAS was forced by GENEA to shut down and severely restrict business activities.  IAS had been invited to sell and had planned on selling six (6) systems to LBA Realty in Irvine, California [LBA].  LBA had potential for many more system installations, as they own and manage over 40 million feet of property in the southwest part of the United States.  As a result of receiving GENEA's C&D Letter and unresolved issues regarding infringement, the LBA project was awarded to GENEA.

43)   Beginning in March, 2012, IAS stopped further development of its WSA business because clients were reluctant to consider WSA systems due to the on-going threat of litigation from GENEA.  As a result of following the demands in the cease and desist letter to stop using and marketing WSA, FULTON completely backed away from several large projects, including the LBA Realty Project discussed above, and also stopped local marketing initiatives and regional sales campaigns in the Greater Los Angeles area.  FULTON could not follow through with OEM marketing campaigns involving Delta Control, Reliable Controls, Distech Controls, and Andover as discussed above and his plans for international expansion into South America, Europe, China, Australia and Canada were terminated.

44)   By 2014, GENEA's refusal to withdraw its C&D Letter prevented IAS from resuming these marketing campaigns.

45)   Since GENEA refused to explain its allegations of infringement and further concealed its claims analysis, IAS could do nothing to prove that WSA did not infringe on the '245 Patent.  IAS took the only reasonable course of action when threatened by potentially ruinous

patent litigation and withdrew from the market.  Clients and customers are still reluctant to consider installing WSA systems because GENEA has not withdrawn its C&D Letter.

**D. Business Plans for WSA and IAS.**

46)    FULTON had developed plans to pursue international markets *via* eBay, *e.g.* South America, Europe, *e.g.* Great Britain, France, and Germany, China, Australia, and Canada. But the continuing restraining effects of GENEA's C & D Letter scuttled all plans for international expansion.

47)    FULTON had a general sales and marketing plans to distribute WSA as an OEM product to several energy management systems manufacturers, none of whom then had an after-hours control system to offer their clientele.  Plaintiffs were in direct talks and negotiations with Delta Controls (deltacontrols.com/), Reliable Controls (reliablecontrols.com), Distech Controls (distech-controls.com), and Andover Controls (ftp.andovercontrols.com).

48)    By 2011 FULTON was working on detailed plans to implement a long-term, strategic plan which was centered on using WSA.  FULTON planned to implement a marketing strategy using the internet for Web-based marketing to small-to-medium sized buildings.  The drop in prices for PCs to between $300-$400/unit opened up new markets for WSA.  This pricing differential and the technical capabilities of WSA gave FULTON a valuable strategic advantage over their competitors.

49)    FULTON's losses caused by GENEA's C & D Letter did not occur immediately  By 2012 as a result of the unresolved issues of GENEA's claims of patent infringement, FULTON had begun to losing substantial business.  Beginning in March, 2012, IAS stopped further development of WSA business because clients were reluctant to consider WSA due to the threat of litigation from GENEA.

50)    Starting in mid-2012, GENEA was on notice that FULTON was suffering damages, including but not limited to, business and financial losses and that Plaintiff exited or severely reduced their businesses as a result of the actions of GENEA.  FULTON was at that time

pursuing international markets in South America *via* eBay, including Europe (Great Britain, France, Germany, etc., China, Australia, and Canada. But the continuing effect of GENEA's cease and desist letter put an early rest to any international expansion, even after GENEA issued a covenant to not sue.

51)    Annual revenue for IAS from the WSA platform for the past 5 years averaged between $45,000-$60,000. During the past two (2) years since mid-2012, ever since GENEA sent its cease and desist letter on June 22, 2011, revenue from WSA has declined sharply. And as a consequence of receiving GENEA's C&D Letter, IAS did not pursue sales opportunities and terminated significant domestic and international business expansion strategies and marketing initiatives.

52)    Since mid-2012, FULTON was inhibited from actively selling WSA declined to pursue leads due to fear of litigation and the uncertainty generated by GENEA's public and private claims of infringement. IAS removed WSA from marketing material and IAS's website at www.iascontrols.net and IAS also cut back on existing and on-going sales efforts that were in the pipeline for fear of reprisals from both GENEA.

53)    Even after GENEA issued its Covenant to Not Sue in December, 2013, IAS cannot use WSA feely because of ongoing doubts about GENEA's claims of infringement and wrongful impact on GENEA's IP.


**V. EVENT SYNOPSIS.**

   **A. GENEA'S '245 Patent Issued by USPTO.**

54)    GENEA's '245 Patent was issued on August 10, 2010.

55)    WSA is prior art to the '245 Patent.

56)    GENEA did not cite WSA as prior art in its patent application.

   **B. GENEA Knew the WSA Technology From Two Prior Inspections of WSA.**

57)   In 2008 GENEA secretly inspected WSA at an installed site [SECRET INSPECTION].  To gain access, GENEA falsely stated that it had been authorized to conduct an inspection.

58)   During 2010 GENEA inspected WSA through the internet [INTERNET INSPECTION].  This search made available all of the pages used by WSA.

59)   Before sending its C & D Letter, GENEA had already gained full access to the WSA software and technology and learned its inner architecture.  As a result, GENEA knew or should have known that WSA did not infringe on the claims of the '245 Patent.

60)   GENEA had no reasonable belief that WSA infringed on its '245 Patent.

61)   Based on its inspections, GENEA had sufficient facts to analyze the functionality of WSA and compare it to the claims of the '245 Patent.  GENEA had sufficient information to conduct a claims infringement analysis without another inspection.

62)   WSA does not use metered energy usage data.  Plaintiffs informed GENEA that WSA does not use metered energy usage date prior to filing this action.  But even when GENEA admitted, on or about December 2013, that WSA did not infringe on the '245 Patent, GENEA still refused to withdraw its C & D Letter.  The C & D letter continues to cause business losses to FULTON.

63)   GENEA knew or should have known that WSA did not use metered energy usage data and therefore did not infringe on any of the claims of the '245 Patent.

64)   GENEA did not ask either FULTON or WSA's developer for information about or an inspection of WSA.  Nor did GENEA seek any information on the features and functionality of WSA from either FULTON or its developer.  FULTON has never been contacted by GENEA about any conflict between WSA and the '245 Patent.  Nor has GENEA contacted either FULTON or the developer about any wrongful impact on intellectual property.

65)   GENEA never provided FULTON with a claims or infringement analysis before or after sending its C & D Letter.

66)    The C & D Letter does not describe any infringing conduct by WSA.  Nor does it identify patent claims infringed.  GENEA provided no information or data that would have assisted FULTON in avoiding willful infringement on Genea's '245 Patent

67)    GENEA never identified any wrongful impact on Genea's intellectual property in its C&D Letter.  GENEA never provided any information to FULTON on any wrongful impact on GENEA's IP.

68)    GENEA never contacted FULTON about infringement on its '245 Patent or wrongful impact on its intellectual property because it already knew that there was no infringement or wrongful impact.

69)    GENEA had no evidence that WSA infringed on the '245 Patent.

70)    GENEA has no evidence that WSA wrongfully impacted GENEA's IP.

**C. Plaintiffs Asked GENEA To Explain Its Allegations of Patent Infringement and Wrongful Impact on Intellectual Property.**

71)    WSA does not infringe on the '245 Patent or GENEA's intellectual property.

72)    FULTON does not wrongfully impact any of GENEA's intellectual property.

73)    The C & D Letter does not specify which claims of the '245 Patent were infringed.

74)    When FULTON inquired about the details of GENEA's claims of infringement multiple times, GENEA had a duty to provide all necessary information and explanations so that Plaintiffs could avoid infringement, if any.

75)    GENEA's attorney at Mintz Levin, John Guist [GUIST] regularly visited Plaintiffs' sales website (WSA.com).  Downloadable files that show WSA invoicing using time-based billing.  Every input and output page of the WSA system is displayed.  No page uses or refers to using metered energy usage data.

**D. GENEA Sent a Cease and Desist Letter Knowing That WSA Did Not Infringe On the '245 Patent.**

76)    In 2011, Genea sent a cease and desist letter [C & D Letter] to FULTON demanding that he stop using WSA and refrain from using any technology which "impacted Genea's intellectual property".

77)     The effect of reading this letter was dreadful and unnerving to FULTON, especially since it came from the law offices of a prominent law firm, Mintz *et al.* in San Diego, California.  Although the letter was threatening, it was also confusing because it did not identify which claims were being infringed upon nor how the infringement was occurring.

78)     GENEA did not provide a claims infringement analysis.  GENEA did not explain how WSA or any of Plaintiff's products or technology impacted GENEA's IP.

79)     GENEA did not identify any of the patent's claims which were allegedly infringed upon.

80)     Defendants VOYSEY, BALKIN, and TAYLOR were involved in writing and authorizing this C&D Letter.  Specific allegation of their roles will be further pled when discovery is permitted.

81)     GENEA threatened to "take all appropriate legal action to protect its intellectual property, including its patent rights."  GENEA also demanded that Plaintiffs "confirm, within 30 days, that you have ceased to market and sell WSA™, or have changed the product significantly so that it is not impacted by GENEA's intellectual property" (emphasis added).

82)     GENEA advised FULTON that GENEA "believes that this patent ['245 PATENT] impacts your present and/or future business with respect to this product (Web Smart Air™), and requests that you cease all efforts that may impact Genea's intellectual property." (letter from John E. Guist to Mark Fulton and John Matter dated June 22, 2011) (emphasis added).

**E. GENEA's Refusal To Describe Any Infringing Conduct Forced FULTON to Abandon WSA.**

83)     As a direct consequence of GENEA's direct request to stop conducting all business in competition with GENEA, as well as its public accusations that WSA infringed on the '245 Patent, FULTON was compelled to quit their businesses built around WSA systems, stop further development of WSA, and forced to abandon plans for future expansion and development internationally through eBay.

84)   During 2012, in response to GENEA's demands, Plaintiffs stopped further development and sales of WSA and curtailed important business development projects using WSA.  Plaintiffs could not resume using or developing WSA business because GENEA refused to provide any information on their allegations of infringement which would have enabled FULTON to avoid willful infringement on the '245 Patent and any wrongful impact on GENEA's intellectual property.

85)   FULTON reasonably calculated that, in the complete absence of infringement information from GENEA, there was a great danger from potential liability from continuing willful infringement, if infringement were found.

86)   FULTON reasonably calculated that any benefit from using or developing WSA any further was far outweighed by the potential liability stemming from GENEA's allegations of infringement.  As a result, FULTON lost substantial sales.  FULTON reasonably concluded that leaving their clients and customers out of this patent dispute, by refraining from marketing, selling or further developing WSA business, was required due to GENEA's allegations.

87)   After January, 2012 customers and clients of FULTON started to decide not to purchase, use or continue to use the WSA technology as a direct and proximate result of GENEA's allegations of infringement the '245 Patent.  This trend continues as a direct and proximate result of GENEA's refusal to withdraw its C&D Letter, even after admitting that there is no infringement or wrongful impact.  FULTON notified GENEA that he was losing business because of GENEA's C&D Letter, to no avail.

**F. GENEA Failed To Describe Infringing Conduct By WSA and Refused to Provide Any Information on its Allegations of Infringement.**

88)   Defendants VOYSEY, BALKIN, and TAYLOR were involved in writing and authorizing this C&D Letter.  GENEA withheld information from the Plaintiffs regarding the impact on GENEA's intellectual property.  Because Plaintiff could not figure out how to do business without impacting GENEA's intellectual property or violating their patents, Plaintiff

stopped using, accessing, and further developing WSA software and equipment.  As a direct and proximate result of this reasonable decision, Plaintiff lost his business initiative and strategic technology position.  In short, Plaintiff was forced to forgo expansion plans due solely to the unresolved issues raised by GENEA's C&D Letter and GENEA's refusal to explain its allegations of infringement.

89)   GENEA's failure to compare WSA's functions with the '245 Patent claims was recklessly <u>oppressive</u> because GENEA subjected Plaintiffs to foreseeable and unjust hardship in the form of avoidable business losses and lost development time.

### G. GENEA's Failed To Conduct a Claims Infringement Analysis Before Sending Its Cease and Desist Letter.

90)   GENEA's failure to provide any justification or explanation of which products of FULTON wrongfully impacted Genea's intellectual property is <u>despicable</u> because reasonable people would expect that people making allegations of wrong doing must explain themselves.

91)   The C & D Letter contained no explanation of GENEA's allegations of infringement, so that FULTON was unable to modify his use of WSA technology and business to avoid willful infringement.

92)   Nor did the C & D Letter contain any claims infringement analysis, so that FULTON was unable to explain to potential clients and customers that there was no infringement.

93)   The letter did not describe any infringing or impacting conduct on GENEA's intellectual property.  Without any information on allegedly infringing conduct, FULTON was unable to fully use, access or further develop WSA systems and businesses since further use and development would have been destroyed or confiscated under the patent law if any infringement were found.

### H. GENEA Counsel John Guist Failed to Explain Allegations of Infringement.

94)   FULTON wrote to GENEA's counsel:  "Given the serious nature of your client's assertions of infringement along with the paucity of supporting facts and argument, and the

fact that they are communicating such accusations to actual and potential customer of my clients, all such activity must stop.  In addition, unless recent claims of patent infringement are further substantiated, my clients require a written acknowledgement that their product and technology does not in any way infringe on your '245, your clients' sole patent, by August 10, 2011."  Email from Richardson to Guist (dated July 23, 2011).

95)    GUIST responded on July 26, 2011:  "As I stated in my phone call, we believe that Web Smart Air system sold by your clients infringes at least claims 1, 6, 7, 8, 10, 13, 16 and 17 of U.S. Patent No. 7,774,245.  This is sufficient information to allow you to undertake your own analysis, given that you have access to that system and how it operates.  Therefore we will not be providing our work product and we will not retract that claim <u>unless you can convince us that there is no infringement</u> (emphasis added)."  Merely identifying claims without an explanation of infringing conduct is insufficient for the Plaintiffs to modify or change WSA™ or their products and technology to avoid willful infringement and wrongful impact.

96)    GUIST went on further to say that:  "Truth is an ultimate defense to defamation and while we believe it to be the truth that your clients infringe we have not been able to uncover any statements made by Genea's employees to any of your existing or potential customer where "infringement" was alleged.  However, Genea and your clients are engaged in a dispute regarding Genea's IP.  The facts that there exists IP, that there exists a dispute, are true and real and not defamation . . .".  *Id.*

97)    Despite numerous requests, GENEA <u>refused</u> to explain its allegations that WSA infringed on the '245 Patent.  When FULTON's counsel stated to GUIST that "I looked for a definition of "metered energy usage data" and found none in the patent nor any in any publicly available source of information", he responded that "[o]ur position is that your clients infringe the stated claims under a reasonable claim construction.  Certainly every term need not have an express definition in the specification.  we [sic] believe that this term is met."

98)   GENEA willfully and intentionally avoided providing the information which Plaintiffs sought and need to avoid willful infringement.

99)   GENEA conducted and then provided only a frivolous claims infringement analysis.

100)  Soon thereafter, GUIST emailed to Mr. Richardson:  "Greg, I'm working on a letter to you, what is your street address?  I'll email you the letter when it is done, just wanted the right address to make the address fields look right."  Guist thus promised to provide a claims infringement analysis.

101)  In reply to this counsel's response providing his then-current address, GUIST stated on November 1, 2011:  "Thanks, hope to have something to you by the end of the week."  And subsequently on November 18, 2011:  "Greg, my letter to you is delayed due to Genea hiring a new CEO who needs to be brought up to speed on the relevant issues.  I'm not sure what is going to happen next (or when) but just wanted to let you know."

102)  Because of the vagueness of Genea's C&D Letter and its lack of a claims infringement analysis, Plaintiffs requested multiple times for an explanation of Genea's claims of infringement.  Genea never supplied an explanation other than to say that under a reasonable interpretation of the claims of the '245 Patent, WSA infringed.  Genea informed Plaintiffs that it was their responsibility to avoid infringement.

103)  When Plaintiffs notified GENEA that there could not possibly be any infringement because WSA did not involve "metered energy usage data", Genea did not respond or engage in further analysis or provide a counter-analysis.  When FULTON requested that GENEA stop making public accusations of infringement, GENEA refused.  When Plaintiffs requested that GENEA withdraw its C&D Letter because no explanation of infringement had ever been provided, again Genea refused.  After many requests for a written explanation of allegations of infringement, Genea finally stated that they would provide an explanation.  Yet, Genea failed to do so.

104)  GENEA broke its promise to provide a claims infringement analysis and failed to provide any information to FULTON which he needed to avoid willful infringement.  This

broken promise was an attempt to delay FULTON from filing a lawsuit and create issues regarding statute of limitations.

## VI. THE FEDERAL ACTION AND GENEA'S FAILURE TO WITHDRAW ITS ALLEGATIONS OF PATENT INFRINGEMENT AND WRONGFUL IMPACT ON ITS INTELLECTUAL PROPERTY.

### A. First Action For Declaratory Relief.

105)  Litigation between the parties began in federal court on September 10, 2012 when Plaintiffs filed an action for declaratory relief in the United States District Court, Southern District of California (SA CV 12–01506) [FEDERAL LITIGATION].  Plaintiffs sought a declaration that WSA does not infringe on the'245 Patent.  On or about December, 2013 Plaintiffs became the prevailing party in the Federal Litigation when GENEA covenanted to not sue Plaintiffs for infringement on the '245 Patent for existing versions of WSA only.

106)  FULTON did not seek a determination that the '245 Patent was invalid in the FEDERAL LITIGATION because he had insufficient information on the scope of the patent claims and damages.  FULTON did not then raise California state law claims because damages and unfair competition claims had not yet fully accrued.

107)  Under a then-existing split of authority among the federal circuits, the covenant-to-not-sue eliminated any federal question arising under the patent laws of the United States under a then-existing split of authority.  Current law provides that a covenant offered by one with the burden of proof of infringement does not eliminate federal question jurisdiction.

### B. GENEA's Third Inspection of WSA.

108)  GENEA conducted a third Inspection of WSA, which lasted about two (2) hours [FEDERAL INSPECTION]  GENEA's expert Dr. Ken Goldberg and VOYSEY, the named inventor of the '245 Patent, took turns inspecting WSA.

109)  GENEA saw the same web pages that are available on www.WSA.com.

110)  GENEA now knows the internal functionality of the WSA platform.  This information gives them a competitive advantage and would not have been acquired but for the inspections.

111)  GENEA did not know that Plaintiffs knew of GENEA's Secret Inspection or Internet Inspection until a hearing on or about October 2013 during the Federal Litigation.

**C.    GENEA Offered a Covenant to Not Sue For Infringing the '245 Patent.**

112)  During the Federal Litigation GENEA delayed acknowledging that WSA did not infringe the Patent '245 until December 2013, even though from inspections in 2008 and 2010 it knew that WSA did not infringe the '245 Patent.

113)  GENEA delayed the covenant-to-not-sue until December 2013 because it wanted to create the impression that it had no grounds for believing that there was no infringement until its Second Inspection of WSA during the Federal Litigation on or about October 2013.

114)  Since the COVENANT-TO-NOT-SUE does not cover the full scope of GENEA's allegations of impact and infringement on Genea's intellectual property, the Plaintiffs were forced into filing this lawsuit.  The damaging consequences of sending the C & D Letter continue to cause damages to the Plaintiffs because the C & D Letter continues to exert an inhibiting effect on Plaintiffs' business by restricting sales and further development of WSA.

115)  GENEA admits that WSA does not infringe on the Patent '245.  But GENEA refuses to withdraw its C & D Letter, thereby continuing the harm caused by the C & D.

116)  The conclusion of the federal litigation did not eliminate state-law claims because the COVENANT-TO-NOT-SUE does not cover the full scope of GENEA's allegations of infringement and wrongful impact on intellectual property.  Actual and potential customers of Plaintiffs continue to cite this patent and intellectual property dispute between the parties as a good reason to not use or purchase anything using WSA.

117)  By sending its C & D Letter, GENEA caused and continues to cause the damages to the Plaintiffs by forcing them to withdraw WSA from the market and refrain from further developing WSA.  GENEA refusal to withdraw its C & D Letter further restricts the Plaintiffs from developing the business and technology based on the WSA technology platform. GENEA continues to benefit from its C & D Letter by obtaining profits and other business benefits which it would not have obtained.

**D. GENEA's Incomplete Covenant-To-Not-Sue Does Not Cover Allegations of Wrongful Impact on GENEA's Intellectual Property.**

118)  By 2013, GENEA promised to not sue Plaintiffs for infringing on the '245 Patent.  But GENEA did not promise to not sue from wrongful impact on its intellectual property.  The Covenant-to-Not-Sue was ineffective because clients and customers of Plaintiffs continue to cite GENEA's allegations of patent infringement and wrongful impact as reasons for declining to use the WSA technology platform.

119)  GENEA never provided a justification for it claims that WSA infringed on the '245 Patent.  Nor did GENEA justify its demands that Plaintiffs cease to market and sell WSA.  By refusing to withdraw its C & D Letter, GENEA continues to maintain their demands that the Plaintiffs stop impacting GENEA's intellectual property.

120)  The customers and clients of the Plaintiffs are pragmatic and have reasonably decided not to use or purchase WSA because of the cloud of suspected infringement which GENEA raised but now refuses to dispel.

**E. GENEA Refused To Withdraw Its Cease and Desist Letter Despite Admitting That WSA Does Not Infringe Upon the '245 Patent.**

121)  GENEA continues to refuse to withdraw its C & D Letter.

122)  GENEA maintains its C & D Letter because it intends to do everything possible to prevent people from using and further developing WSA.

123)  Potential clients and customers of Plaintiffs are reluctant to involve themselves with physical installations of WSA due to Genea's allegations of patent infringement and wrongful impact on its intellectual property.  GENEA continues to gain an unfair competitive edge over the Plaintiffs and the Plaintiffs continue to lose business and full access to their WSA technology platform and associated business due to GENEA's conduct.

124)  In sum, GENEA's use of a cease and desist letter to deter the Plaintiffs from competing with them is anti-competitive.  Sending its C & D was unfair because GENEA sent its C & D Letter without any description of infringing conduct.

125)  GENEA actions are <u>oppressive</u> and <u>unfair</u> because Plaintiffs need a description of infringing conduct in order to avoid willful infringement, assuming that infringement exists.

126)  GENEA's refusal to provide claims infringement analysis is <u>fraudulent</u>.  As a result of Genea's C & D Letter alleging impact on its intellectual property, Genea owed a duty to FULTON to respond to inquiries regarding any alleged infringement or impact on Genea's intellectual property so that FULTON could avoid future infringement, if any existed.  As a result of sending a C & D Letter without a description of any infringing conduct, GENEA owed a duty to FULTON further explain its allegations of infringement.

127)  On November, 2011 GENEA's counsel GUIST promised to provide a claims infringement analysis, but failed to do so.  Had FULTON known that said promise would be breached, they would have filed their Complaint much sooner.

## VII. VIOLATIONS ALLEGED
### <u>COUNT 1</u> -- Conversion

128)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

129)  Plaintiff uses property consisting of tangible software and hardware systems which can be converted.  The technology platform WSA consists of tangible forms of software on hardware and computer systems.  FULTON has rights to possess and access these WSA systems and computers using WSA software and business equipment supported by WSA.

130)  FULTON has the right to use and possess their technology, business, and intellectual property, including WSA and associated business equipment, without interference caused by Genea.  Upon receiving Genea's C&D Letter, FULTON has the right to an explanation from GENEA regarding its allegations of infringement and wrongful impact on GENEA's IP in order to avoid future infringement and wrongful impact and to protect themselves from the consequences of willful infringement.

131)  By July 26, 2012 it became apparent that Genea wrongfully refused to provide a description of the conduct infringing on its '245 Patent and wrongfully impacting GENEA's

IP.  Since infringement might have been found, a description of allegedly infringing conduct was needed by the FULTON because Genea threatened to deprive FULTON of his possession of and access to the WSA technology platform and related business property through confiscation or destruction of WSA under the patent laws.  FULTON also required a description of infringing conduct to avoid liability for willful patent infringement and wrongful impact on Genea's intellectual property.

132)  Genea <u>wrongfully</u> refused to explain its allegations of patent infringement and wrongful impact on intellectual property in order to increase pressure on FULTON to stop using, selling, and further developing the WSA technology platform.  Genea concealed infringement information with the intent to force FULTON to abandon and/or stop using, selling, and accessing the WSA technology platform for fear of ruinous patent litigation and liability for willful infringement.

133)  Genea continues to <u>substantially interfere</u> with FULTON's of the use and possession of their products and technology by failing to withdraw its cease and desist letter which still alleges patent infringement and wrongful impact on Genea's intellectual property.  Genea's C&D Letter is still relied upon by actual and potential clients and customers of Plaintiff in declining to use or consider WSA technology platform.

134)  By refusing to withdraw its C&D Letter, Genea continues to <u>intentionally</u> and <u>substantially interfere</u> with the FULTON's right to possess and access the WSA technology platform and related business property.  Maintaining the C&D Letter creates continuing doubts as to whether WSA infringes on Genea's '245 Patent and wrongfully impacts GENEA's IP.  As a direct and proximate result of Genea's failure to withdraw its C&D Letter, FULTON has essentially stopped using and developing WSA and actual and potential clients and customers of FULTON have stopped purchasing WSA equipment.  At one point, given GENEA's allegations of infringement on its '245 Patent, FULTON lost his rights to possess and access WSA equipment.

135)  FULTON did not consent to Genea's concealment of infringement information and the resulting <u>substantial interference</u> with the WSA technology platform and its accompanying business equipment.  Genea's action harmed FULTON by forcing them to reduce usage and future development of the WSA equipment and technology, so that FULTON eventually abandoned WSA and its associated business equipment.

136)  By withholding information on allegations of patent infringement and wrongful impact on GENEA's IP, Genea <u>substantially interfered</u> with FULTON's rights to possess, use, access, modify, and further develop the WSA technology and business equipment by threatening ruinous patent litigation which would have ended up with the confiscation and destruction of WSA equipment.

137)  FULTON was harmed by Genea's refusal to explain its allegations of infringing conduct because infringement on the '245 Patent would eventually result in the confiscation or destruction of the WSA platform under the patent laws.  Without an explanation of infringing conduct, FULTON could not modify WSA systems in order to avoid willful infringement.

138)  FULTON continues to be harmed by Genea's refusal to withdraw its allegations of wrongful impact on Genea's intellectual property and Genea's failure to identify which products and technology of FULTON wrongfully impact Genea's intellectual property because actual and potential clients and customers of FULTON decline to use or consider WSA technology.

139)  Genea's failure to describe the conduct infringing on its patent and refusal to identify which products and technology wrongfully impact GENEA's IP were a <u>substantial factor</u> in causing business losses to the FULTON and preventing him from the full use, access, future development, and possession of the WSA technology platform equipment and business. Genea's failure to withdraw its cease and desist letter after December, 2013 continues to be a <u>substantial factor</u> in causing business losses to the FULTON and preventing him from fully using WSA equipment.

140)  The last of the above-cited actions of Genea causing damages to FULTON, *e.g.* GENEA's refusal to withdraw its C&D Letter, occurred within two (2) years of the filing date of this Complaint and the damages continue to accrue.  Plaintiff's claims for conversion under the UCL started to accrue when the last of the above-cited actions by GENEA causing damages to the Plaintiff occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013.  This accrual occurs within four (4) years of the filing of this Complaint and within the statute of limitations for UCL claims.

141)  As a result of giving up the use of and access to WSA property and associated business and technology, FULTON suffered damages based on the market value of his WSA business and WSA systems in a sum according to proof but exceeding the jurisdictional limits of this court.

### COUNT 2 -- Trespass To Chattels

142)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

143)  Plaintiff owns business equipment using the technology platform WSA which consists of tangible forms of software on hardware and computer systems.  FULTON has the right to possess and access systems and computers using WSA software and business equipment supported by WSA.

144)  By July 26, 2012 it became apparent that Genea refused to provide a description of the conduct allegedly infringing on its '245 Patent and wrongfully impacting Genea's intellectual property.  This refusal was wrongful because Genea had a duty to inform FULTON of what the infringing conduct was, if any, so that FULTON could avoid future willful patent infringement and unnecessary wrongful impact on Genea's intellectual property.

145)  As a result of the FULTON requesting an explanation from Genea about Genea's allegations of infringement on its intellectual property, Genea owed a duty to Plaintiff to disclose facts that would explain its allegations.  Genea knew or should have known that it owed a duty to provide a description of infringing and impacting conduct by WSA.  Genea

knew or should have known that WSA did not wrongfully impact GENEA's IP or infringe on Genea's '245 Patent as a result of its prior inspections.

146)   By refusing to provide the requested information regarding infringing conduct and wrongful impact, <u>Genea intended</u> to interfere with Plaintiff's use and possession of systems and equipment with WSA installed by forcing Plaintiff to abandon WSA.  At the same time, Genea intended to discourage actual and potential clients from purchasing and using WSA systems and equipment.

147)   Plaintiff did not consent to Genea's interference with computers and systems using WSA by, among other actions, refusing to accede to Genea's demands to cease using and marketing WSA.

148)   Genea refusal to explain its allegations of patent infringement and wrongful impact on Genea's intellectual property was wrongful and caused Plaintiff harm because such explanation was withheld in order to increase the pressure on Plaintiff to stop using, selling, and further developing WSA technology platform.  Genea's refusal to provide any description of infringing conduct was motivated by a desire to thereby force Plaintiff to abandon and/or stop using, selling, and accessing the WSA technology platform for fear of ruinous patent litigation and liability for willful infringement.

149)   Genea continues to <u>substantially interfere</u> with Plaintiff's use and possession of their products and technology including WSA equipment by failing to withdraw its C&D Letter which still alleges patent infringement and wrongful impact on Genea's intellectual property.  This letter is still relied upon by actual and potential clients and customers of Plaintiff in declining to use or consider WSA technology.  Maintaining the C&D Letter creates continuing doubts in the minds of actual and potential clients and customers of Plaintiff as to whether WSA infringes on Genea's '245 Patent and wrongfully impacts GENEA's IP.

150)   As a direct and proximate result of Genea's failure to withdraw its C&D Letter, Plaintiff has suffered losses because he has had to essentially stop using and developing the WSA technology platform.

151)  By withholding information on allegations of patent infringement and wrongful impact on Genea's intellectual property, Genea's actions became a <u>substantial factor</u> in causing Plaintiff to abandon WSA equipment and technology.  This in turn caused actual customers and clients who were contemplating using WSA to decide not to purchase and/or use WSA.  Genea's failure to withdraw its cease and desist letter after December, 2013 continues to be a <u>substantial factor</u> in causing business losses to the Plaintiff and preventing him from fully using WSA equipment, technology, and business.

152)  The last of the above-cited actions of Genea causing damages for trespass to chattels occurred within two (2) years of the filing date of this Complaint and the damages continue to accrue.  Plaintiff's claims for trespass to chattels under the UCL started to accrue when the last of the above-cited actions by GENEA causing damages to the Plaintiff occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013.  This accrual occurs within four (4) years and within the statute of limitations for UCL claims, of the filing of this Complaint.

153)  As a result of giving up access to and use of property incorporating WSA technology and its accompanying business, Plaintiff suffered damages based on the market value of WSA in a sum according to proof but exceeding the jurisdictional limits of this court.

### <u>COUNT 3</u> -- Implied Contract And Quantum Meruit

154) Plaintiff re-allege and incorporate the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

155)  The Plaintiff owns and manages installations using the technology platform WSA and has rights to possess and access systems with WSA technology implemented and the business supported by WSA.  Genea wanted to obtain the WSA technology platform and the business supported by it.  By demanding that Plaintiff "cease[] to market and sell WSA" and refusing to provide a description of infringing or impacting conduct, Genea knew or should have known that Plaintiffs would asset to Genea's demands.

156)  By refusing to withdraw its C&D Letter as of December 2013, Genea continues to <u>intentionally</u> and <u>substantially</u> interfere with Plaintiff's right to possess, access, and further develop the WSA technology platform and business property.  By way of a non-exhaustive example, a reasonable jury could find that maintaining the C&D Letter creates continuing doubts as to whether WSA infringes on GENEA's '245 Patent and wrongfully impacts GENEA's IP.

157)  Plaintiff agreed to Genea's demands by shutting down parts of its WSA business and stopping further development of their WSA business, thereby conferring a significant benefit on Genea by reducing competition and handing over business to Genea.

158)  Genea agreed to Plaintiff actions by covenanting to not sue for infringement on its '245 Patent, thereby conferring a significant benefit on Plaintiff by eliminating Genea's threats of litigating for willful infringement on its '245 Patent.

159)  Plaintiff was harmed by Genea's refusal to explain its allegations of infringing conduct because infringement on the '245 Patent would eventually result in the confiscation or destruction of the WSA systems under the patent laws.  Without an explanation of the infringing conduct, Plaintiff could not modify WSA systems in order to avoid infringement.  Plaintiff continues to be harmed by Genea's refusal to withdraw its allegations of wrongful impact on GENEA's IP because actual and potential clients and customers of Plaintiffs decline to use WSA due to the allegations of infringement.

160)  Within the last four (4) years since filing this Complaint, by the conduct of the parties, an implied contract was formed in which Genea demanded that Plaintiff "cease[] to market and sell WSA" and in return Genea would not to "take all appropriate legal action to protect its intellectual property, including its patent rights."  Plaintiff ceased to market and sell WSA in compliance with Genea's demand.  In return, Genea has not taken any legal action to protect its intellectual property and patent rights.

161)  Plaintiff's claims for breach of implied contract and quantum meruit under the UCL started to accrue when the last of the above-cited actions by GENEA causing damages to the

Plaintiff occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013. This accrual occurs within four (4) years of the filing of this Complaint and within the statute of limitations for UCL claims.

162)  As a result of giving up access to and use of property incorporating WSA technology and its accompanying business by acceding to Genea's demands to give up WSA, Genea owes Plaintiff the reasonable market value of the systems using the WSA technology platform and the underlying business in a sum according to proof, but exceeding the jurisdictional limits of this court.

### COUNT 4 -- Intentional Misrepresentation And Deceit

163)  Plaintiffs re-allege and incorporate herein the allegations of the preceding paragraphs as if fully set forth herein.

164)  Genea, through authorized agents Keith Voysey, Chief Technology Officer, David Balkin, position unknown, and Chris Taylor, position unknown, in the C & D Letter, represented that WSA infringed on Genea's '245 Patent and that Plaintiff's products and technology wrongfully impacted Genea's intellectual property.  The exact roles of these defendants is unknown, but when discovery is allowed to proceed, Plaintiff will amend this Complaint.  So far, discovery by Plaintiff has been unfairly stifled, while GENEA was granted permission to conduct an intrusive inspection of WSA.

165)  By sending a C&D Letter without a description of the infringing conduct or the wrongful impact on Genea's intellectual property, Genea intended to deceive Plaintiff into believing that WSA infringed on Genea's '245 Patent and that Plaintiff's products and technology wrongfully impacted GENEA's IP.

166)  Genea knew that its representation that WSA infringed on Genea's '245 Patent was false when it sent its C&D Letter because Genea had already secretly inspected WSA in 2008 and conducted another inspection in 2010.  GENEA should be estopped from claiming any infringement since it failed to cite WSA as prior art in its patent application at the USPTO.

167)  Genea knew that its representation that WSA infringed on the claims of the '245 Patent were false through its internet inspection of WSA in 2010.  Genea now knows that WSA does not infringe on the '245 Patent based on its inspections.  Yet Genea continues to maintain its allegation of infringement on its '245 Patent and wrongful impact on GENEA's IP.

168)  Genea made these representations recklessly since it had sufficient information to know the lack of infringement as a result of its secret inspection of WSA in 2008 and internet viewing of WSA on or about 2010.  Genea made these representations without regard for the truth of its allegations because Genea did not perform a claims infringement analysis.  Genea representations were reckless because it could have, but did not, request an inspection of WSA and the products and technology of the Plaintiffs before sending its C&D Letter.  Genea's refusal to withdraw these false representations even after covenanting to not sue for infringement in December, 2013 are reckless because it has sufficient information from its three inspections of WSA to know that there is no infringement.

169)  Genea intended that Plaintiff rely on the representations in Genea's C&D Letter in order to prevent the Plaintiff from further developing WSA and further expanding the Plaintiff's business using WSA.

170)  Plaintiff reasonably relied upon Genea's representations that WSA infringed on Genea's '245 Patent and that their products and technology impacted Genea's intellectual property by curtailing Plaintiff's use of WSA in order to avoid any willful infringement.  Plaintiff's actions in reducing or eliminating using and developing WSA was reasonable because of the threat of ruinous patent infringement litigation, the prospect of willful infringement, as well as the possibility of confiscation or destruction of WSA computer systems if patent infringement were proven.  These actions of Plaintiff were necessary because, without any explanation from Genea describing any infringing conduct, Plaintiff was unable to explain to their customers and clients that there was no infringement.

171)  As a direct result of Genea's failure to explain its allegations of patent infringement in its C & D Letter and thus preventing the Plaintiff from changing or modifying WSA to avoid infringing on Genea's '245 Patent, since 2012 Plaintiff began to suffer business losses as a result of not being able to use and access WSA or further develop products, technology, and business using WSA to avoid impacting Genea's intellectual property.

172)  These representations are false because WSA does not infringe on Genea's '245 Patent and Plaintiff's products and technology do not impact Genea's intellectual property. Genea concealed the fact that WSA does not infringe on Genea's '245 Patent by not including a description of infringing conduct in the C&D Letter.  Genea further concealed the fact of non-infringement by refusing to provide a claims infringement analysis upon the request of Plaintiffs.  Genea failed to disclose that WSA does not infringe on the '245 Patent by failing to provide a claims infringement analysis.

173)  As a direct and proximate result of receiving Genea's C&D Letter and reading Genea's demand to stop using and marketing WSA, Plaintiff relied on Genea's statements contained within the C&D Letter by reducing and/or stopping use of their own technology and by exiting and/or suffering losses and reductions in their own businesses.  Plaintiff's compliance with Genea's demand to "cease[] to market and sell WSA" was reasonable due to the threats of ruinous patent litigation, the lack of a claims infringement analysis from Genea, and Genea's failure to describe any infringing conduct.  These actions were reasonable in light of the Plaintiff's intent to avoid willful infringement and desire to avoid future potential confiscation of infringing systems incorporating WSA, should infringement be found.

174)  Plaintiff's reliance on Genea's conduct and C&D Letter in reducing or stopping use and further development of the WSA technology and related business was reasonable in view of Genea's threats of ruinous patent litigation, its demand to "cease[] to market and sell WSA", and the threat of confiscation and destruction of property incorporating WSA under the patent laws.

175)  As a direct and proximate result of the actions of Genea in sending the C&D Letter and thereafter refusing to explain its allegations of infringement on Genea's intellectual property, Plaintiff lost the use and value of their intellectual property and business based on WSA and its products and technology.  As a direct and proximate result of Genea's failure to withdraw the C&D Letter, even after covenanting to not sue in the federal litigation, Plaintiff continues to suffer business losses due to Genea's continues assertion of wrongful impact on Genea's intellectual property.

176)  Genea's actions were _malicious_ in that it had sufficient information about WSA when it sent the C&D Letter to know or conclude that WSA did not infringe on Genea's '245 Patent through its secret inspection in 2008 and internet inspection in 2010.  Even then, Genea could have obtained sufficient information to know that WSA did not infringe on Genea's '245 PATENT or impact Genea's intellectual property by requesting an inspection.  Genea ignored Plaintiffs statement that WSA could not possibly infringe on Genea's '245 Patent because WSA did not use user metered energy usage data.  Yet Genea _willfully_ sent its C&D Letter knowing that it would oppress Plaintiff into complying with Genea's demand to "cease[] to market and sell WSA".

177)  Genea's actions were _deceitful_ in that it refused to disclose or make available information on any infringing or impacting conduct by WSA, even though the Plaintiff had requested such information multiple times and even though Genea knew that its allegations of infringement and impact on its intellectual property and '245 Patent were false.

178)  Genea's actions as stated herein were _oppressive_ in that they were done with intent to keep Plaintiff from using WSA to compete in the markets in which the parties compete. Genea's refusal to withdraw its C & D Letter is _oppressive_ against the Plaintiffs since Genea knows full well that there is no infringement and because Genea is able to continue benefiting from its false allegations of infringement and wrongful impact on its intellectual property.

179)  Late in the game, Genea promised to provide a claims infringement analysis, but Genea ultimately failed to do so.  Genea's actions as described above, including its broken

promise to provide a claims infringement analysis, were malicious, deceitful, and oppressive in that they prevented Plaintiff from exercising their rights to use WSA and their products and technology without interference, thus entitling the Plaintiff to an award of punitive damages.

180)  Genea, through their authorized agents Keith Voysey, Chief Technology Officer, David Balkin, position unknown, and Chris Taylor, position unknown, in Genea's C & D Letter, made or authorized the above-cited actions.  The exact roles of these defendants are unknown, but when discovery is allowed to proceed, Plaintiff will amend this Complaint to be plead specific newly discovered fact.  So far, discovery by Plaintiff has been unfairly stifled, while GENEA was granted permission to conduct an intrusive inspection of WSA.

181)  The last of the series of actions by Genea cited above causing damages to Plaintiff occurred within three (3) years of the filing of this Complaint and damages continue to accrue.  Plaintiff's claims for intentional misrepresentation and deceit under the UCL started to accrue when the last of the above-cited actions by GENEA causing damages to the Plaintiff occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013.  This accrual occurs within four (4) years of the filing of this Complaint and within the statute of limitations for UCL claims.

182)  As recited herein, GENEA's action were malicious, deceitful, and oppressive because GENEA did not perform a claims infringement analysis and then refused to provide information necessary to avoid willful infringement and wrongful impact, thereby directly and proximately causing Plaintiff to suffer damages from lost assets and lost or reduced business opportunities in a sum according to proof but exceeding the jurisdictional limits of this court.

### <u>COUNT 5</u> -- Fraudulent Misrepresentation Regarding Claims Of Patent Infringement And Wrongful Impact on GENEA's IP.

183)  Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

184)  Genea, through their authorized agents Keith Voysey, Chief Technology Officer, David Balkin, position unknown, and Chris Taylor, position unknown, in Genea's C & D Letter, represented that WSA infringed on Genea's '245 Patent and that Plaintiffs' products and technology wrongfully impacted GENEA's IP. Genea made the representations above when it knew, or should have known, that they were false due to prior inspections of WSA in 2008 and through the internet about 2010.  Genea also knew or should have known that WSA did not infringe on Genea's '245 Patent because Plaintiff informed them that WSA did not use user metered energy usage data.

185)  The representations above were made by Genea's authorized agents with the intent to fraudulently force the Plaintiff from the marketplace in which the parties compete and to preclude the Plaintiff from using, further developing or having access to WSA and the Plaintiff's products and technologies.

186)  Even now, Genea refuses to withdraw these representations of patent infringement and impact on Genea's intellectual property with the intention of harming Plaintiff's business through creating doubt in the marketplace in which the parties compete as to whether WSA may infringe on Genea's '245 Patent and whether Plaintiff's products and technology wrongfully impact GENEA's IP.

187)  Even after covenanting not to sue in the federal litigation, Genea continues to benefit from its allegations of patent infringement and wrongful impact on Genea's intellectual property and oppress Plaintiff who still cannot fully use or further develop WSA because the covenant to not sue does not specify the software process for which Genea will not sue.

188)  As a direct and proximate result of sending its C&D Letter without including any description of any infringing conduct, Genea knowingly, willfully, and wrongfully failed to disclose facts relevant to determining if WSA infringed on Genea's '245 Patent and whether the products and technology of Plaintiff wrongfully impacted Genea's intellectual property.

189)  Genea's concealment of these material facts about the relationship between its own technology and the products and technology of Plaintiff was malicious because it prevented

the Plaintiffs from avoiding willful infringement and wrongful impact.  Genea's non-disclosure and concealment of these facts prevented Plaintiff from explaining to their customers and clients that there was no infringement.

190)  By failing to request or even conduct an inspection of the WSA platform before sending its C&D Letter, Genea did not do everything reasonable to investigate its allegations that WSA infringed on Genea's '245 Patent and that Plaintiff's products and technology wrongfully impacted Genea's intellectual property.  By failing to do everything reasonable before demanding that the Plaintiff stop marketing and selling WSA, Genea acted recklessly and oppressively against Plaintiff by forcing him to stop or reduce usage and development of the WSA platform and related products and technology.

191)  By failing to request any information from the Plaintiffs concerning the WSA platform before sending its C&D Letter, Genea was willfully reckless in not evaluating whether WSA infringed on Genea's '245 Patent and whether the Plaintiff's products and technology wrongfully impacted Genea's intellectual property.

192)  After sending the C & D Letter, Genea owed duties to Plaintiff to explain its allegations of impact on GENEA's IP, which would have assisted Plaintiff to avoid further wrongful impact, if any.  GENEA also owed a duty to describe conduct infringing on Genea's '245 Patent, which would have assisted Plaintiff in avoiding willful infringement, if any.

193)  Genea violated and continues to violate these duties owed to Plaintiff by withholding and concealing information which would have aided Plaintiff in avoiding wrongful impact on GENEA's IP, if any, and avoiding willful infringement on the '245 Patent, if any.

194)  Genea knew or should have known, based on it secret inspection of WSA in 2008 and its internet inspection in 2010 that WSA did not wrongfully impact Genea's intellectual property or infringe on Genea's '245 Patent.  Before sending its C&D Letter, Genea had no reasonable grounds for believing that WSA infringes on the '245 Patent or that the Plaintiffs' products and technology wrongfully impacted GENEA's IP.

195)  Upon receiving a cease and desist letter, Plaintiff has a right to know the facts underlying any allegation of impact on intellectual property or infringement on a patent of the sender in order to prepare a response to a cease and desist letter.  By refusing to explain its allegations of impact or provide a description of impacting conduct or withdraw the C&D Letter in December, 2013 after promising not to sue, Genea knew that such silence would have a deleterious effect on Plaintiff's ability to further develop WSA and its business.

196)  Despite promising not to sue for infringement on its '245 Patent for present versions of WSA, Genea nonetheless maintains its C&D Letter and its threats to sue for impact on GENEA's IP and future versions of WSA.  Refusing to withdraw said letter is done in complete disregard of the rights of Plaintiff's to know the facts of any alleged impact on Genea's intellectual property, since Plaintiff has no way of knowing how to further develop WSA business without infringing on Genea's '245 Patent and other intellectual property.

197)  Plaintiff has a right to compete in the markets in which the parties compete.  By sending its C&D Letter in June, 2011, Genea intended to force the Plaintiff from the businesses and markets in which they compete.  Genea knew or should have known that by sending its C & D Letter and refusing to explain any infringing conduct, that Plaintiff would withdraw from the markets in which the parties compete in order to avoid willful infringement.  By refusing to withdraw its C&D Letter in December, 2013, Genea intends to continue to force Plaintiff from the businesses and markets in which the parties compete, and as a result Genea unfairly interferes with the Plaintiff's right to compete.

198)  With the threat of potentially ruinous willful infringement and in the absence of any information on infringement from Genea, Plaintiff took a reasonable course of action and justifiably relied to their detriment on Genea's representations by severely reducing and eventually stopping use of WSA systems and equipment.  Said course of action was reasonable in order to eliminate the potential any finding of willful infringement on Genea's '245 Patent and wrongful impact on Genea's intellectual property.

199)  As a direct and proximate result of receiving the C & D Letter from Genea and Genea's refusal to provide any description of infringing conduct or wrongful impact on Genea's intellectual property, Plaintiff reasonably relied on Genea's statements of infringement on Genea's '245 Patent and wrongful impact on Genea's intellectual property by reducing and/or stopping further development the WSA technology platform and business in order to avoid willful infringement and further wrongful impact, if any.

200)  Genea's allegations of impact on GENEA's IP are false.  Genea's promise to not sue Plaintiff for infringement on the '245 Patent for present versions of WSA does not include suits for impact on GENEA's IP.

201)  Genea's allegations of patent infringement are in fact false, as Genea admitted in its covenant to not sue in the federal litigation.

202)  Genea's refusal to withdraw its C&D Letter Genea's actions in maintaining it are oppressive against Plaintiff because Genea intends to reduce and/or interfere with Plaintiff's further development of WSA business by creating continuing doubt about infringement and wrongful impact on Genea's intellectual property.

203)  As a direct and proximate result of Genea's misrepresentation that WSA infringed on Genea's '245 Patent and that Plaintiff's products and technology wrongfully impact GENEA's IP, Plaintiff has suffered damages from lost assets and lost or reduced business in a sum according to proof but exceeding the jurisdictional limits of this court.

204)  Genea, through their authorized agents Keith Voysey, Chief Technology Officer, David Balkin, position unknown, and Chris Taylor, position unknown, in Genea's C & D Letter, made or authorized the above-cited actions.  The exact roles of these defendants are unknown, but when discovery is allowed to proceed, Plaintiff will amend this Complaint to be specific.  So far, discovery by Plaintiff has been unfairly stifled, while GENEA was granted permission to conduct an intrusive inspection of WSA.

205)  Because Genea acted maliciously, willfully, and in knowing disregard of the rights of Plaintiffs to be free of false accusations of wrongful impact on Genea's intellectual property and infringement on the '245 Patent, Plaintiff is entitled to punitive damages.

206)  The last of the above-cited actions of Genea giving rise to fraudulent misrepresentation that caused damages to Plaintiff occurred within three (3) years of the filing of this Complaint and damages continue to accrue.  Plaintiff's claims for fraudulent misrepresentation under the UCL started to accrue when the last of the above-cited actions by GENEA causing damages to the Plaintiff occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013.  This accrual occurs within four (4) years of the filing of this Complaint and within the statute of limitations for UCL claims.

207)  As a direct and proximate result of Genea's concealment or non-disclosure of facts that would have demonstrated that WSA did not infringe on Genea's '245 Patent, Plaintiff has suffered damages from lost assets and lost or reduced business in a sum according to proof but exceeding the jurisdictional limits of this court.

### COUNT 6 -- Intentional Interference With Prospective Economic Advantage

208)  Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

209)  FULTON had an economic relationship with John Matter that would have resulted in an economic benefit to Mr. Fulton. Genea knew of the economic relationships between John Matter and Mark Fulton because GENEA addressed its C&D Letter to both FULTON and the developer of WSA.

210)  Genea intended to disrupt the economic relationships between John Matter and Mark Fulton by sending its C&D Letter and thereafter refusing to provide any description of patent infringing conduct and failing to explain any wrongful impact on GENEA's IP.

211)  Genea engaged in wrongful conduct by sending its C&D Letter without first performing a claims infringement analysis.  Genea then wrongfully refused to provide any

description of infringing conduct.  Genea wrongfully refused to identify any products or technology of Plaintiff that wrongfully impacted GENEA's IP.  Genea wrongfully concealed facts that WSA did not infringe on Genea's '245 Patent and that Plaintiff's products and technology did not wrongfully impact GENEA's IP.

212)  The actions by Genea disrupted the economic relationships between John Matter and Mark Fulton by preventing Plaintiff from using and further developing the WSA technology platform to generate business.  The refusal of Genea to explain its allegations in its C&D Letter prevented Plaintiff modifying his systems using WSA to avoid infringing on Genea's '245 Patent, resulting in other customers and clients of Plaintiff FULTON from using and/or buying WSA systems.

213)  Genea intended to disrupt contractual and economic relations FULTON had with Mr. Matter and other individuals and business entities by making representations alleging that WSA infringed on Genea's '245 Patent and that Plaintiff's products and technology wrongfully impacted GENEA's IP.  By sending a cease and desist letter demanding that Plaintiff "cease[] to market and sell WSA", GENEA intended to disrupt FULTON's relationship with the developer of WSA and Plaintiffs clients.  By sending its C&D Letter without any description of infringing conduct, Genea intended to interfere with the economic relationship between the Plaintiffs by forcing them to stop further development and use of WSA, thereby eliminating Plaintiff as competition.

214)  At the time of the actions of Genea as described herein, Plaintiff had prospective economic relationships with other multiple individuals and businesses, including competitors. Genea knew about these prospective economic relationships.  Genea knew about the contractual and prospective economic relationships Plaintiff had with other persons and entities since the parties competed on the same bids and have a long history of competing with each other.

215)  Genea, by making public allegations against the Plaintiffs for patent infringement, through sending the cease and desist letter demanding that the Plaintiffs cease to use any

product or technology that impacts GENEA's IP, by failing to respond to the Plaintiff's requests for clarification of infringement claims, and by failing to withdraw its C&D Letter after admitting that the WSA technology platform did not infringe on Genea's '245 Patent, did willfully and intentionally disrupt the prospective economic relationships Plaintiff had with Mr. Matter and third parties.

216)  As a direct and proximate result of the actions of Genea described herein, Plaintiff has suffered actual disruption to its prospective economic relations with each other and with third parties in a sum according to proof but exceeding the jurisdictional limits of this court.

217)  Genea's failure to provide a description of infringing conduct or identify the products and technology that wrongfully impacted Genea's intellectual property or infringed on its '245 Patent was <u>malicious</u> because Genea intended to cause harm to Plaintiffs' business using WSA.  Genea's conduct was <u>despicable</u> because no reasonable person would deliberately prevent another person from, if necessary, modifying their conduct or products to avoid allegations of infringement and wrongful impact.

218)  Genea's refusal to provide Plaintiff with infringement information was <u>willful</u> and in <u>knowing disregard</u> of the rights of Plaintiff's to modify WSA to avoid willful infringement, if any.  Genea acted in knowing disregard of Plaintiff's right to receive a description of infringing conduct in order to avoid future willful infringement, if any.

219)  Genea's failure to disclose the facts supporting its allegations of wrongful impact on its intellectual property and infringement on its '245 PATENT was <u>malicious</u> because Genea withheld such information in knowing disregard of the dangerous consequences for Plaintiff for being unable to avoid willful infringement.  Genea's actions were <u>despicable</u> because Genea inflicted cruel and unjust hardship on Plaintiff by preventing them from modifying WSA to avoid willful infringement, if infringement occurred.

220)  Genea's failure to include any description of infringing conduct in its C&D Letter, its refusal to provide facts needed to determine whether infringement occurred, and its maintenance of the threats in the C&D Letter after December, 2013 were and are <u>oppressive</u>

because Genea intended to prevent or limit Plaintiff's ability to use WSA technology in its current or future forms to compete with Genea.

221)  Genea, through their authorized agents Keith Voysey, Chief Technology Officer, David Balkin, position unknown, and Chris Taylor, position unknown, in Genea's C & D Letter, made or authorized the above-cited actions.  The exact roles of these defendants are unknown, but when discovery is allowed to proceed, Plaintiff will amend this Complaint to be specific.

222)  As recited herein, Genea's malicious, deceitful, and oppressive actions in intentionally preventing Plaintiff from exercising their rights to use and further develop the WSA platform entitle Plaintiff to an award of punitive damages.

223)  The last of the above-cited actions of Genea giving rise to intentional interference with prospective economic relations and causing damages to Plaintiff occurred within three (3) years of the filing of this Complaint.  Damages continue to accrue.  Plaintiff's claims for intentional interference with prospective economic relations under the UCL started to accrue when the last of the above-cited actions by GENEA causing damages to the Plaintiff occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013.  This accrual occurs within four (4) years of the filing of this Complaint and within the statute of limitations for UCL claims.

224)  As recited herein, Genea's actions were and are malicious, deceitful, despicable, and oppressive towards Plaintiff and were a direct and proximate cause of Plaintiff suffering damages to the prospective economic relationships with third parties in a sum according to proof but exceeding the jurisdictional limits of this court.

225)  As a direct and proximate result of the actions of Genea as described herein, Plaintiff suffered and continues to suffer actual disruption to its prospective economic relations with other individuals and business entities in a sum according to proof but exceeding the jurisdictional limits of this court

## COUNT 7 -- Negligent Interference With Existing And Prospective Economic Relations

226)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

227)  At the time of the actions of Genea as described herein, Plaintiff had economic relationships with the developer of WSA and with third parties.

228)  Genea knew about these economic relationships.  By way of a non-exhaustive example, GENEA addressed its C&D Letter to FULTON and John Matter, the developer of WSA.

229)  At the time of the actions of Genea as described herein, Genea owed a duty to Plaintiff to investigate its own claims of wrongful impact on its technology and business before making representations and public accusations that the WSA technology platform violated Genea's intellectual property.  Genea owed a duty to Plaintiff to investigate its own claims of infringement before sending its C & D Letter demanding that Plaintiff leave the market in which the parties were competing and to "cease[] to market and sell WSA".

230)  Genea owed a duty to Plaintiff to respond to inquiries from Plaintiff regarding Genea's allegations of infringement of its intellectual property, so that Plaintiff could avoid future willful infringement, if infringement existed.

231)  By failing to include a description of infringing conduct in its C & D Letter and failing to respond to Plaintiff's inquires, Genea failed in the above-mentioned duties.

232)  By way of a non-exhaustive example, GENEA failed to adequately investigate its claims of infringement and wrongful impact by, *e.g.* by failing to request an inspection of a WSA, by failing to conduct an inspection of a WSA, and failing to request or obtain information on WSA from the Plaintiff.  Genea failed to do everything reasonable that it could have done before sending its C & D Letter to avoid disrupting the economic relationships between Plaintiff and third parties.

233)  Genea failed to provide any description of infringing or impacting conduct by WSA, even though it had a duty to do so.  Genea failed to adequately respond to Plaintiffs' request for explanation of claims of infringement and wrongful impact on intellectual property.

234)  Genea knew or should have known that its actions as described herein could cause the Plaintiffs to reduce their business activity related to the WSA technology platform with each other and to lose business with third parties as a direct and proximate result of Genea's demand to Plaintiff to "cease[] to market and sell WSA".

235)  Genea knew or should have known that its refusal to withdraw its C & D Letter would continue to cause damage to the economic relationships between the Plaintiff and third parties.  Genea could have foreseen that its actions as described herein could and did cause Plaintiff to stop selling and developing the WSA technology platform in order to avoid willful infringement, if any.

236)  Genea, by making public accusations against Plaintiff for patent infringement, by sending the C & D Letter demanding that Plaintiff cease to use any technology that impacts Genea's technology, by failing to adequately respond to the Plaintiff's inquiries regarding the basis of claims of infringement, and by refusing to withdraw its C & D Letter after admitting that there was no infringement in the federal litigation in order to prevent Plaintiff from protecting themselves from willful infringement, violated one or more business duties imposed by the laws of the State of California or the laws of the United States.

237)  After demanding that Plaintiff cease to market or sell WSA, it was foreseeable that Plaintiff would stop using, selling, and further developing the WSA technology platform, thereby interfering with potential and existing economic relations between the Plaintiff and other entities.

238)  Genea, by failing to perform a claims infringement analysis before sending its C & D Letter and by refusing to provide information to Plaintiff upon their request regarding a description of infringing conduct, did negligently disrupt the contractual and prospective economic relationships Plaintiff has or had with third parties.

239)  Genea's actions as recited herein were a <u>substantial factor</u> in causing Plaintiff harm.

240)  As a direct and proximate result of the actions of Genea as described herein, Plaintiff has suffered, and continues to suffer after Genea's refusal to withdraw it C & D Letter, damage to its contractual and prospective economic relations with third parties in a sum according to proof but exceeding the jurisdictional limits of this court.

241)  Genea's failure to provide a description of conduct that impacted its intellectual property or infringed on its '245 Patent was <u>malicious</u> because Genea intended to prevent Plaintiff from avoiding future willful infringement.  Genea's failure to disclose the facts supporting its allegations of wrongful impact on its intellectual property and infringement on its '245 Patent were negligent because it knew or should have known that there was no wrongful impact or infringement on Genea's intellectual property or patents.

242)  Genea's above recited action were <u>oppressive</u> because Genea did these actions with the intent of preventing Plaintiff from using WSA in its current or modified form to avoid willful infringement and to continue competing with Genea.

243)  Genea's actions as recited herein were <u>despicable</u> because no reasonable person would deliberately prevent another person from, if necessary, modifying their conduct or products to avoid allegations of infringement and wrongful impact.  These actions were so malicious, deceitful, and oppressive in preventing Plaintiff from exercising their rights to use and modify WSA so as to entitle Plaintiff to an award of punitive damages.

244)  Genea, through their authorized agents Keith Voysey, Chief Technology Officer, David Balkin, position unknown, and Chris Taylor, position unknown, in Genea's C & D Letter, made or authorized the above-cited actions.  The exact roles of these defendants are unknown, but when discovery is allowed to proceed, Plaintiff will amend this Complaint to be specific.

245)  The last of the above-cited actions of Genea giving rise to negligent interference with economic relations causing damages to Plaintiff occurred within three (3) years of the filing of this Complaint and damages continue to accrue.  The last of the above-cited actions of

Genea giving rise to negligent interference with economic relations occurred within three (3) years of the filing of this Complaint and damages continue to accrue.  Plaintiff's claims for fraudulent misrepresentation under the UCL started to accrue when the last of the above-cited actions by GENEA causing damages to the Plaintiff occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013.  This accrual occurs within four (4) years of the filing of this Complaint and within the statute of limitations for UCL claims.

246)  As recited herein, Genea's actions were and are malicious, deceitful, despicable, and oppressive towards Plaintiff and were a direct and proximate cause of Plaintiff suffering damages to prospective economic relationships with third parties in a sum according to proof but exceeding the jurisdictional limits of this court.

247)  As recited herein, Genea's actions were a <u>substantial factor</u> in causing harm to Plaintiff and were a direct and proximate cause of Plaintiff suffering damages to the prospective economic relationships with third parties in a sum according to proof but exceeding the jurisdictional limits of this court.

### <u>COUNT 8</u> --**Unfair Competition Under California Business And Professions Code § 17200.**

248)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

249)  This cause of action is brought pursuant to Unfair Competition Law at **Business & Professions Code** [**BPC**] § 17200 *et seq.*  Genea's conduct constitutes unfair, unlawful and/or fraudulent business practices within the meaning of **BPC** § 17200.

250)  By way of a non-exhaustive example, GENEA sent a broadly cease and desist letter alleging infringement on a patent and other intellectual property but never identified in any way any infringing conduct.  Sending such a threatening letter is <u>unfair</u> because GENEA thereby required Plaintiff to respond by conducting an investigation of infringement on his own, but then GENEA failed and refused to cooperate by providing any information on its

allegations of infringement.  Members of the public are likely to be deceived into thinking that GENEA IP is infringed because GENEA did not withdraw its C&D Letter.

251)  Since GENEA was in the exclusive possession of infringement information, and GENEA bore the burden of establishing infringement, GENEA's failure to conduct a claims infringement analysis or to provide any information on infringement to Plaintiff caused Plaintiff unnecessary harm and wasted effort.  A reasonable jury could conclude that GENEA's refusal to provide the results of a claims infringement analysis violated GENEA's duties created by its C&D Letter and was <u>unfair</u> to Plaintiff.

252)  In the final analysis, GENEA's refusal to provide any claims infringement analysis deceived and continues to deceive members of the public since they could reasonably conclude that GENEA' allegations of infringement are true.  Members of the public are likely to be deceived by GENEA's refusal to withdraw its C&D Letter, into thinking that there is some basis for GENEA's allegations of infringement.

253)  GENEA sent a cease and desist letter to the Plaintiff claiming that WSA and his products infringed on Genea's 245 Patent and IP with no intention of suing Plaintiff for infringement on its intellectual property or enforcing the '245 Patent.  A reasonable jury could conclude that sending a threatening cease and desist letter threatening litigation but then failing to follow through by alleging infringement when given the opportunity is <u>unfair and fraudulent</u>.

254)  GENEA unlawfully abused the judicial process by waiting to issue its covenant to not sue until the very last moment during the prior litigation.  GENEA did not learn anything during discovery in the First Federal Action that it did not already know from its SECRET INSPECTION in 2008 and its INTERNET INSPECTION in 2010.  A reasonable jury could conclude that GENEA unfairly waited to issue its covenant to not sue.

255)  GENEA violated duties to substantiate its claims of infringement by refusing to respond to Plaintiffs' inquiries about the specifics of Genea's allegations that WSA infringed on Genea's '245 Patent and Plaintiff's products infringed on GENEA's IP.  GENEA violated

its duty to fully inform Plaintiff of conduct that infringed on its '245 Patent.  By wrongfully refusing to provide infringement information in order to prevent Plaintiff from modifying WSA to avoid willful infringement, GENEA acted unfairly.

256)  Genea violated FRCP Rule 11 by sending its C&D Letter without first performing a claims infringement analysis or performing only an inadequate infringement analysis.  GENEA could have, but did not, seek information or an inspection of WSA from the Plaintiff or the developer of WSA.  Thereafter, GENEA promised, but ultimately failed to provide, Plaintiff with an explanation of its claims infringement.  GENEA forced Plaintiff to file an action for declaratory relief in federal court seeking a declaration that WSA did not infringe on Genea's '245 Patent.  A reasonable jury could infer from this conduct that GENEA abused the judicial process by all along intending to issue a covenant to not sue, but unfairly waited until the last minute.

257)  Additionally, Genea violated the **FRCP** by sending its C&D Letter alleging infringement, but then not including any counterclaims in its answer in the federal lawsuit claiming that WSA infringed on Genea's '245 Patent.

258)  GENEA's conduct constituted fraudulent concealment because GENEA concealed its clandestine inspection of WSA in 2008 under false pretenses in order to make it appear that Genea had no information about WSA.

259)  GENEA's '245 Patent is invalid since GENEA violated the public policies of the Patent Laws and the rules for applying for a patent.  GENEA unlawfully failed to disclose WSA as prior art in its patent application at the USPTO, yet contradicted itself by later alleging infringement by WSA.  GENEA's is unlawfully asserting its '245 Patent because it is invalid because its claims are obvious in view of the teachings of WSA, in violation of 35 **U.S.C.** 1 *et seq.*.

260)  After the federal litigation was completed, Genea refused to withdraw its C&D Letter after admitting in the federal litigation that its claims of infringement were false.  By maintaining letter, GENEA unlawfully continues its false allegations of infringement that

Genea knew or should have known were false.  GENEA failed to disclose the basis of its original allegations of infringement in its C&D Letter in order to preclude Plaintiff from seeking modifications to the WSA to avoid willful infringement of Genea's '245 Patent and continuing to infringe on GENEA's IP.  Members of the public who use or are familiar with building energy management systems are likely to be deceived as to the validity of GENEA's '245 Patent and GENEA's allegations that WSA infringes.  A reasonable jury could conclude that GENEA's refusal to withdraw its C&D Letter unfairly stifles competition.

261)  GENEA violated one or more duties imposed by the laws of the State of California and the United States by preventing the Plaintiffs from fulfilling their duties to avoid willful infringement by withholding infringement information.

262)  The actions of Genea were <u>subjectively in bad faith</u> because Genea declined to seek to enforce its '245 Patent when given the opportunity in its answer in the federal litigation.  By way of example, GENEA has never sought to enforce the '245 Patent through counter claims in its answer or even file an amended answer containing such counter-claims.  Moreover, GENEA never sought to protect or enforce GENEA's IP.

263)  The actions of Genea were <u>objectively in bad faith</u> because Genea did not have reasonable grounds to allege infringement since Genea failed to conduct a claims infringement analysis before sending its C&D Letter.  GENEA had sufficient information from its SECRET INSPECTION of WSA in 2008 and its INTERNET INSPECTION in 2010 to know that WSA did not infringe on Genea's '245 Patent and that Plaintiffs products and technologies did not wrongfully impact GENEA's IP.

264)  The above actions of Genea were <u>oppressive</u> and in <u>bad faith</u> because Genea made false allegations of infringement without any reasonable basis for alleging infringement on its '245 Patent and IP.  By way of example, GENEA failed to respond to or acknowledge Plaintiff's counter-assertion that WSA could not infringe on Genea's '245 Patent since the claims in the '245 Patent were based upon using user metered energy usage data, which information WSA does not use.

265)  The above actions of Genea were <u>unlawful</u> and <u>fraudulent</u> because they are based on fraudulent misrepresentations which were made with the intent of interfering with the economic relations between Plaintiff, the WSA developer, and third parties.

266)  The above actions of Genea were <u>unlawful</u> and in violation of duties of patentees to not make false or unsubstantiated allegations of patent infringement.  Plaintiff was given no information about Genea's allegations of patent infringement and wrongful impact on GENEA's IP.  These allegations have not been withdrawn and continue to deter actual and potential clients of Plaintiff from using and buying WSA systems.  GENEA's actions have been unfair because Plaintiff was given no opportunity to demonstrate non-infringement due to GENEA's refusal to provide any claims infringement analysis.  Members of the public who are familiar with systems managing the energy use of buildings are likely to be deceived by GENEA's actions and non-actions.

267)  The above-cited actions of Genea are <u>oppressive</u> because Plaintiff cannot further develop WSA business to avoid infringing on Genea's 245 Patent because Genea never provided any information on how current versions of WSA infringe on Genea's '245 Patent or how Plaintiff's products or services infringed on GENEA's IP.  Yet Plaintiffs have had to spend years and much expense in countering GENEA's patent trolling tactics.

268)  The above actions of Genea <u>anti-competitive</u> because Genea gained customers, clients, and business which it would not have obtained without raising doubts about patent infringement on the '245 Patent and wrongful impact on GENEA's IP.  Such <u>anti-competitive</u> effects have not been ameliorated by Genea's covenant to not sue for patent infringement because Genea failed to withdraw its C&D Letter which actual and future clients and customers of Plaintiff can continue to rely upon and consider when deciding to not use WSA systems.

269)  There is no business justification for the above-cited actions of Genea because there is no privilege for making false allegations in order to gain customers and market share.  No reasonable person could believe that GENEA's allegations of infringement were true because

GENEA has refused to provide any specific facts backing up its claims of patent infringement and wrongful impact on GENEA's IP.  No reasonable person could believe that GENEA's '245 Patent is valid after it failed to cite WSA as prior art in its patent application but then alleged infringement by WSA in its C&D Letter.  Members of the public are likely to be deceived as to the validity of the '245 Patent.

270)  The above actions of Genea are not <u>authorized by law</u>.  By way of example, GENEA's actions are not protected by the litigation privilege since they never intended to sue for infringement, and GENEA's actions are not protected by the First Amendment since GENEA never described any conduct by Plaintiff that infringed on the '245 Patent or GENEA's IP.

271)  The above actions of Genea are <u>not privileged</u> because Genea had no intention of enforcing Genea's '245 Patent and did not attempt to enforce this patent when given the opportunity to allege patent infringement in counter-claims in its original answer in the federal litigation.  In addition, GENEA did not file an amended answer asserting counter-claims for infringement.

272)  A reasonable person would have discovered the factual basis of this UCL claim only when GENEA issued its covenant-to-not-sue during December 2013, without however ever providing a claims infringement analysis or demonstrating that it had conducted one before sending the C&D Letter.

273)  Plaintiff's claims for UCL started to accrue when the last of the above-cited actions by GENEA causing damages to the Plaintiffs occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013.  This accrual occurs within four (4) years and within the statute of limitations for UCL claims.  Damages continue to accrue.

274)  As a direct and proximate result of Genea's actions as described herein, the Plaintiff suffered damages to its business reputation, intellectual property, and actual disruption to its prospective economic relations with other individuals and business entities in a sum according to proof but exceeding the jurisdictional limits of this court.

## COUNT 9 -- Trade Libel

275)  Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

276)  Genea owed a duty to competitors and the Plaintiff to not make false allegations of wrongful impact on GENEA's IP or infringement on its '245 Patent.

277)  By way of a non-exhaustive example, GENEA intentionally made statements in its C&D Letter which it intended to be published and the heard by third parties.  Genea knew or should have known that its allegations that Plaintiffs products and technology, including WSA, wrongfully impacted Genea's patents and intellectual property would be communicated broadly within the close-knit industry in which the parties compete.

278)  Once Genea made allegations of infringement on its '245 Patent and wrongful impact on its intellectual property, Genea owed a duty to Plaintiff to identify such infringement and wrongful impact in order that Plaintiff could avoid further infringement and impact, if any. Genea violated these duties by withholding information regarding its allegations of patent infringement and wrongful impact on GENEA's IP.

279)  Genea intentionally made false allegations which were eventually communicated to existing and potential customers of Plaintiffs that WSA infringed on Genea's '245 Patent and that Plaintiff's products and technology wrongfully impacted GENEA's IP.  Actual and potential customers of Plaintiff then avoided using WSA systems because of outstanding allegations of patent infringement and wrongful impact on GENEA's IP.

280)  Genea knew or should have known that its allegations were false since it had sufficient information from its SECRET INSPECTION in 2008 and its INTERNET INSPECTION in 2010 to conclude that WSA did not infringe on Genea's '245 Patent and that the Plaintiffs' products and technologies did not wrongfully impact GENEA's IP.

281)  By failing to conduct a claims infringement analysis or seek information or an inspection from Plaintiff or WSA's developer before sending its C&D Letter, Genea recklessly disregarded the truth that there was no infringement and no wrongful impact on

GENEA's IP.  Genea acted despicably when it ignored Plaintiff's communication that WSA could not possibly infringe on its '245 Patent since WSA did not use metered energy usage data, a key component of the claims of the '245 Patent.  No reasonable person would ignore such clear evidence of non-infringement and then refuse to withdraw its C&D Letter.

282)  Genea's allegations of patent infringement and wrongful impact on GENEA's IP have directly injured Plaintiffs in their profession, trade, and business and devalued the trademark WSA since Plaintiff has lost sales and opportunities to further develop WSA as a result of Genea's allegations.  Genea's refusal to withdraw its C&D Letter continues to injure Plaintiff in their profession, trade, and business and continue to devalue WSA systems because actual and potential clients and customers do not want to become involved with systems using WSA.

283)  The actions of Genea as described herein resulted in publication of Genea's allegations of wrongful impact on its intellectual property and infringement on its '245 Patent. Many clients and customers of Plaintiff have become aware of and acted upon Genea's allegations by stopping use of WSA systems and declining to use WSA equipment.  Actual and potential clients of Plaintiff continue to refuse or decline to use WSA systems because Genea has refused to withdraw its C&D Letter.

284)  Genea's allegations of infringement on its '245 Patent and wrongful impact on GENEA's IP, which arose out of its C&D Letter as well as other conduct cited herein, are in fact false.

285)  Genea's allegations of infringement were not privileged because Genea had no intention to sue to enforce its '245 Patent or to sue for infringement of GENEA's IP.  By way of a non-exhaustive example, GENEA declined to assert patent infringement in any counter-claims in its answer in the Federal Litigation and also failed to file an amended answer containing counter-claims for patent infringement.

286)  Genea's allegations of infringement, by natural consequence, caused damages to Plaintiff and the reputation of WSA, business, and technology platform by encouraging actual

and potential clients and customers of Plaintiffs to stop using WSA systems.  Genea's refusal to withdraw its C&D Letter continues causing these damages and is <u>despicable</u> because no reasonable person would deliberately keep a cloud of infringement and wrongful impact allegations alive after admitting that there was no infringement.

287)  Genea knew or should have recognized that someone else, besides the Plaintiff, might act in reliance upon Genea's allegations of patent infringement and wrongful impact on GENEA's IP.

288)  The publication of Genea's false statements continues today whenever clients and customers of Plaintiff learn about and rely upon Genea's claims of patent infringement and wrongful impact on GENEA's IP.  Such publication occurs frequently today since customers are reluctant to use WSA systems because of Genea's outstanding allegations of infringement and wrongful impact on GENEA's IP.

289)  Plaintiffs discovered the falsity of Genea's statements within two (2) years of filing this Complaint.  A reasonable person would have learned about the falsity either when GENEA provided a claims infringement analysis, which it never did, or when GENEA issued a covenant to not sue, which however covered only allegations of infringement on the '245 Patent.

290)  Genea's above-cited actions were a <u>substantial factor</u> in causing harm to Plaintiff because without Genea's false statements staying alive, actual and potential clients and customers of Plaintiff would continue to buy and use WSA systems.  By way of a non-exhaustive example, a customer of FULTON backed-out of a contract to buy and use WSA systems.

291)  Genea's above-cited actions were <u>malicious</u> because Genea acted with intent to cause injury to Plaintiffs, *e.g.* by losing customers.

292)  Genea's actions were <u>despicable</u> because no reasonable person would accuse someone of infringing on a patent without performing a claims infringement analysis and then refuse to

give the accused infringer any information on how to avoid further willful infringement, if any.

293)  Genea's actions were <u>oppressive</u> because Genea caused Plaintiff cruel and unjust hardship as a result of not explaining its allegations of patent infringement and wrongful impact on GENEA's IP.

294)  Genea's actions were <u>fraudulent</u> because it misrepresented that WSA infringed on Genea's '245 Patent and IP but then concealed information which Plaintiff could have used to demonstrate non-infringement.

295)  As a result, Plaintiffs are entitled to an award of punitive damages.

296)  Genea, through their authorized agents Keith Voysey, Chief Technology Officer, David Balkin, position unknown, and Chris Taylor, position unknown, in Genea's C & D Letter, made or authorized the above-cited actions.  The exact roles of these defendants are unknown, but when discovery is allowed to proceed, Plaintiffs will amend this Complaint to be specific.

297)  The last of the above-cited actions of Genea giving rise to trade libel and causing damages to Plaintiff occurred within two (2) years of the filing of this Complaint and damages continue to accrue.  Plaintiff's claims for trade libel under the UCL started to accrue when the last of the above-cited actions by GENEA causing damages to the Plaintiffs occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013.  This accrual occurs within four (4) years of the filing date of this Complaint and within the statute of limitations for UCL claims.

298)  As recited herein, Genea's actions were and are malicious, deceitful, despicable, and oppressive towards Plaintiff and were a direct and proximate cause of Plaintiff suffering damages in the trade in a sum according to proof but exceeding the jurisdictional limits of this court, thereby entitling Plaintiff to punitive damages.

299)  As recited herein, Genea's actions were a <u>substantial factor</u> in causing harm to the Plaintiffs and were a direct and proximate cause of the Plaintiffs suffering suffer damages to

the prospective economic relationships with third parties in a sum according to proof but exceeding the jurisdictional limits of this court.

### COUNT 10 -- Business Defamation

300) Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

301)  GENEA intentionally made public allegations to an industry trade group that WSA infringed on its '245 Patent.  By making such public statements, GENEA misrepresented the nature, characteristics, qualities of Plaintiff's goods, services, and commercial activities.

302)  By way of a non-exhaustive example, GENEA intentionally alleged in a C&D Letter that WSA infringed on its '245 Patent and that Plaintiff's goods and services infringed on GENEA's IP.  By making such allegations to a competitor within a tightly-knit business community, GENEA knew or should have known that its allegations of infringement would reach ears beyond those of Plaintiff.

303)  GENEA knew or should have known that said allegations and statements would become public knowledge.  Through said statements, GENEA misrepresented the nature, characteristics, qualities of Plaintiff's goods, services, and commercial activities.

304)  As a direct and proximate result of false allegations of infringement on the '245 Patent and GENEA's IP, GENEA directly injured Plaintiff in his professions, trade, businesses, and tarnished systems using WSA.  By way of example only, actual and potential customers of Plaintiff are now not willing to use WSA technology or they have withdrawn from commitments to use or consider WSA.

305)  By making public accusations against Plaintiff for patent infringement and through sending the C&D Letter demanding that Plaintiff cease to use any technology that impacts GENEA's IP, GENEA defame Plaintiff in his business.  Then, by failing to adequately respond to the Plaintiff's inquiries regarding Genea's claims of infringement, and by failing to withdraw its C&D Letter after admitting in the Federal Litigation that its claims of

infringement were false, GENEA continues to misrepresent the nature, characteristics, qualities of Plaintiff's goods, services, and commercial activities.

306)   The actions of GENEA as described herein resulted in publication of GENEA's false allegations of infringement.  By way of example, the allegations and statements made in the C&D Letter became known within the relevant industry, resulting in several clients of Plaintiff to refrain from using WSA systems.

307)   Genea's allegations of infringement are defamatory of Plaintiff.

308)   Genea's allegations of infringement are in fact false.  However, Plaintiff could not allege the falsity of GENEA's statements because Plaintiff had to first conduct an investigation.  By way of example, Plaintiff requested a claims infringement analysis from GENEA, but GENEA never provided one.  Plaintiff learned facts sufficient to allege misrepresentation, at the earliest, only when GENEA covenanted to not sue for patent infringement in December, 2013.

309)   Genea's allegations of infringement were not privileged.  By way of example, GENEA owed a duty to Plaintiff to conduct a claims infringement analysis to support GENEA's allegations of infringement and provide at least some of the results to Plaintiff, but GENEA failed or refused to do so.

310)   Genea's allegations of infringement, by natural consequence, caused and continue to cause damages to Plaintiff's business and to the WSA technology platform and related business.

311)   Plaintiff suffered harm from the actions of Genea as cited above within the past three (2) years from the filing date of this Complaint and the damages continue to accrue. Plaintiff's claims for business defamation started to accrue when the last of the above-cited actions by GENEA causing damages to the Plaintiffs occurred, *e.g.* GENEA's refusal to withdraw its C&D Letter in December 2013.  This accrual occurs within four (4) years of filing this Complaint and within the statute of limitations for UCL claims.  Damages continue to accrue.

312)  As a direct and proximate result of Genea's actions as described herein, Plaintiff suffered damages to its trademark, intellectual property, and actual disruption to its business and prospective economic relations with individuals and business entities in a sum according to proof but exceeding the jurisdictional limits of this court.

**COUNT 11 -- Declaratory Judgment of Non-Infringement on the '245 Patent.**

313)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

314)  As a result of the unsettled state of affairs left by Genea's mere covenant to not sue for present versions of WSA, Plaintiff continue to suffer business losses due to Genea's conduct. By way of example, Plaintiff was not put as good a position as he was before GENEA sent its C&D Letter.

315)  An actual controversy arose and continues to exist between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that the Defendants' covenant to not sue for present versions of WSA does not restore Plaintiff to as good a position as he was before Defendants sent a cease and desist letter, whereas Defendants dispute these contentions and contends that merely promising to not sue for infringement for present versions of WSA is by itself not harmful to Plaintiff.

316)  There is a real, immediate, substantial, and justiciable controversy between the Plaintiff and Defendants concerning whether GENEA's refusal to withdraw its C&D Letter is sufficient to dispel GENEA's previous unsubstantiated allegations of infringement and refusal to provide a claims infringement analysis.

317)  Plaintiff is unable to determine which conduct or products induced GENEA to make allegations of infringement on its '245 Patent and GENEA's IP.

318)  Plaintiffs desire a judicial determination of the rights and duties of the parties so that Plaintiff may resume business as conducted before GENEA made unsubstantiated and unwithdrawn allegations of infringement on GENEA's IP.

319)  Plaintiffs desire the following judicial declarations:

320)  That WSA does not infringe on Genea's '245 Patent;

321)  That future versions of WSA cannot infringe on Genea's '245 Patent;

322)  That none of the products and technologies of the Plaintiffs wrongfully infringe on any of GENEA's IP;

323)  That there are continuing financial burdens caused by Genea's C&D Letter and GENEA's refusal to withdraw it;

324)  That the conduct of Genea prevented Plaintiff from using, selling, or further developing business and systems using WSA technology;

325)  That the conduct of Genea was unfair, oppressive, and malicious.

326)  That Genea's conduct interfered with the economic relations between the Plaintiff and third parties;

327)  That Genea and the Plaintiff entered into an implied contract for the sale of FULTON's WSA business and associated systems to GENEA a fair market value;

328)  That Genea's covenant to not sue does not eliminate the deleterious effects of Genea's allegations of patent infringement and wrongful impact on GENEA's IP.

329)  That one or more of Genea's claims in its '245 Patent are invalid and unenforceable.

330)  Other judicial declarations deemed necessary as this case progresses.

331)  A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain their rights and duties, obtain compensation for WSA and associated businesses, and resume business as usual using WSA without allegations of infringement, if possible.

### <u>COUNT 12</u> -- Declaratory Judgment That the Claims of GENEA's '245 Patent Are Not Patentable Under 35 U.S.C. 101 Because They Contain Matter Not Eligible For Patent Protection.

234)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

235)  In order for subject matter to be patentable, it must be eligible.  By way of a non-exclusive example, the software methods of GENEA's '245 Patent are not eligible for patent protection because they contain well-known accounting ideas, mental processes, and abstract intellectual concepts.

236)  An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that GENEA's '245 Patent covers unpatentable software methods, whereas Defendants maintain the validity of the '245 Patent.

237)  There is a real, immediate, substantial, and justiciable controversy between the Plaintiff and Defendants concerning whether the claims of Genea's '245 Patent include any new and useful process, machine, or manufacture which is patentable under 35 **U.S.C.** §101.

238)  Plaintiff is entitled to a judicial declaration that one or more claims of Genea's '245 Patent constitute ineligible matter for patents.

239)  Plaintiffs desire a judicial determination of the rights and duties of the parties regarding the eligibility of the claims of the '245 Patent for patentability.

240)  A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain his rights and duties and eventually obtain compensation for losses due to GENEA's asserting an invalid patent.

**COUNT 13 -- Declaratory Judgment That the Claims of GENEA's '245 Patent Are Not Patentable Under 35 U.S.C. 102 Because They Constitute Prior Art and Lack Novelty.**

241)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

242)  In order for a claimed invention to attain and keep the status of an issued patent, the claim must be novel.  An invention is not novel if it is known within the prior art or if, to a person or ordinary skill and knowledge in the art, it is obvious.

243)  By way of a non-exhaustive example, the WSA technology was known to GENEA while its application was pending at the USPTO.  WSA is so similar to the claims of the '245

Patent that GENEA sent a C&D Letter alleging infringement without even requesting an opportunity to inspect from Plaintiff. A person of ordinary skill and knowledge in the art who knows of WSA would deem that the claims of the '245 Patent are obvious and lack novelty.

244) An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that GENEA's '245 Patent covers an invention already in public use and used in WSA, including prior art known to GENEA at the time of its patent application, whereas Defendants maintain the validity of the '245 Patent and the novelty of its claims.

245) Plaintiff maintains that GENEA did not invent all of the claims of the '245 Patent because the functionality of the claims is covered by the functionality of WSA and other prior art, whereas GENEA maintains that it is the sole inventor or assignee from the sole inventor.

246) There is a real, immediate, substantial, and justiciable controversy between the Plaintiff and Defendants concerning whether the claims of Genea's '245 Patent include any new and useful process, machine, or manufacture which is patentable under 35 **U.S.C.** §102.

247) Plaintiff is entitled to a judicial declaration that one or more claims of Genea's '245 Patent constitute prior art and lack novelty.

248) Plaintiffs desire a judicial determination of the rights and duties of the parties regarding the eligibility of the claims of the '245 Patent for patentability.

249) A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain his rights and duties and obtain compensation for losses due to GENEA's asserting an invalid patent and resume business as usual using WSA.

**COUNT 14 -- Declaratory Judgment That the Claims of GENEA's '245 Patent Are Not Patentable Under 35 U.S.C. 103 Because They Are Obvious.**

250) Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

251)  In order for a claimed invention to attain and keep the status of an issued patent, the claim must not be obvious to one possessing ordinary skill in the art, at the time the invention was created.

252)  By way of a non-exhaustive example, the WSA technology was known to GENEA while its application was pending at the USPTO.  WSA is so similar to the claims of the '245 Patent that GENEA sent a C&D Letter alleging infringement without even requesting an opportunity to inspect from Plaintiff.  WSA makes the claims of the '245 Patent obvious to one of ordinary skill in the software arts.

253)  An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that GENEA's '245 Patent covers obvious subject matter which as a whole would have been obvious before the effective filing dates of the claimed invention to a person having ordinary skill in the art, whereas Defendants maintain the non-obviousness of the claims of the '245 Patent.

254)  Plaintiff maintains that the claimed invention disclosed in the claims of the '245 Patent was obvious given that GENEA had already inspected WSA before or during GENEA's patent application at the USPTO, *i.e.* during its SECRET INSPECTION and INTERNET INSPECTION.

255)  The differences between WSA and other prior art and the claims of the '245 Patent are such that the subject matter of the patent would have been obvious at the time of the invention to a person having ordinary skill in the art.  By way of illustration, if GENEA knew of the functionality of WSA through its two prior inspections and the information freely available on the Internet, and that functionality infringed on GENEA's '245 Patent, then obviously WSA makes the claims of GENEA's '245 Patent obvious.

256)  There is a real, immediate, substantial, and justiciable controversy between the Plaintiff and Defendants concerning whether the claims of Genea's '245 Patent are obvious and patentable under 35 **U.S.C.** §103.

257)  Plaintiff is entitled to a judicial declaration that one or more claims of Genea's '245 Patent are obvious in view of the prior art, including but not limited to WSA.

258)  A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain his rights and duties and eventually obtain compensation for losses due to GENEA's asserting a patent covering obvious claims.

### COUNT 15 -- Declaratory Judgment That the Claims of GENEA's '245 Patent Contain Subject Matter That is Not Patentable Under 35 U.S.C. 112(a) Because of a Lack of Enablement.

259)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

260)  The Specification of a patent must describe how to make and use the claimed invention.  If the Specification does not describe how to make and use the invention, then the claimed invention is not enabled and is thereby invalid.

261)  By way of one non-exclusive example, the Specification for the '245 Patent does not define the term or words user metered energy usage data.  Yet the claims of the '245 Patent use this term and these words.  Hence, the '245 Patent is not enabled by the Specification.

262)  An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that the specification of GENEA's '245 does not describe how to make and use the claimed invention, whereas Defendants maintain that the '245 Patent is enabled.

263)  There is a real, immediate, substantial, and justiciable controversy between the Plaintiff and Defendants concerning whether the claims of Genea's '245 Patent are enabled under 35 **U.S.C.** §112(a).  By way of example only, the '245 Patent uses phrases including user metered energy usage data, but the specification lacks any definition of this or similar term.

264)  Plaintiff is entitled to a judicial declaration that one or more claims of Genea's '245 Patent is not enabled.  By way of example only, Plaintiff inquired of John Guist whether the

specification included a definition of metered user energy usage data, and Mr. Guist replied that such a definition was not necessary.

265)  A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain his rights and duties and eventually obtain compensation for losses due to GENEA's asserting a patent which is invalid due to a lack of enablement.

**COUNT 16 -- Declaratory Judgment That the Claims of GENEA's '245 Patent Are Invalid and Unenforceable Due to GENEA's Failure to Disclose WSA As Prior Art in its Application at the USPTO.**

266)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

267)  Applicants for a patent have a duty to cite or inform the USPTO of all relevant prior art while an application for a patent is pending.  By way of one example, if a system infringes on a claim of a patent, then it must necessarily be prior art.

268)  GENEA knew about the WSA technology by 2008 at the latest through its SECRET INSPECTION.  GENEA learned further about WSA through its INTERNET INSPECTION in or around 2010.  GENEA knew or should have known about WSA since that product's software and webpages are freely available on the Internet.

269)  WSA is prior art to the claims of the '245 Patent because GENEA cited WSA as infringing on GENEA's '245 Patent in its C&D Letter.

270)  GENEA did not cite WSA as prior art in its application for the '245 Patent at the USPTO.  GENEA knew about WSA while its application was pending.

271)  An actual controversy has arisen and now exists between Plaintiff and Defendants concerning their respective rights and duties in that Plaintiff contends that GENEA committed fraud on the USPTO by failing to disclose the WSA technology platform as prior art in its application for the '245 Patent, whereas Defendants maintain that the WSA platform in not prior art and that GENEA's '245 Patent is valid.

272)  There is a real, immediate, substantial, and justiciable controversy between the Plaintiff and Defendants concerning whether the claims of GENEA's '245 Patent are

anticipated by the WSA platform.  There is a similarly urgent controversy over whether GENEA was obligated to disclose WSA in its patent application.

273)  Plaintiff is entitled to a judicial declaration that the WSA platform is prior art to the '245 Patent and that GENEA was obligated to disclose or cite WSA as prior art in its patent application.  As result of failing to disclose relevant prior art which GENEA knew about, GENEA's '245 Patent is invalid and unenforceable.

274)  A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiff may ascertain his rights and duties and eventually obtain compensation for losses due to GENEA's asserting a patent which is invalid due to fraud on the USPTO.

## COUNT 17 -- Declaratory Judgment of Non-Infringement on GENEA's Other Intellectual Property.

280)  Plaintiff re-alleges and incorporates the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

281)  An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties in that Plaintiffs contend that the Defendants' covenant to not sue for present versions of WSA does not restore Plaintiff to as good a position as they were in before Defendants sent a cease and desist letter to Plaintiff, whereas Defendants dispute these contentions and contends that merely promising to not sue for infringement on its '245 Patent does not alleviate GENEA's demands that FULTON cease infringing on GENEA's other intellectual property.

282)  There is a real, immediate, substantial, and justiciable controversy between the Plaintiff and Defendants concerning whether FULTON infringes on any of GENEA's IP.

283)  Plaintiff is entitled to a judicial declaration that FULTON does not infringe and has not infringed on GENEA's IP so that he can resume business as usual.

284)  A judicial declaration is necessary and appropriate at this time under the circumstances in order that FULTON may ascertain his rights and duties and eventually obtain compensation for loss of business related to using WSA and associated businesses.

285)   As a result of the unsettled state of affairs left by Genea's mere covenant to not sue for present versions of WSA, FULTON continues to suffer business losses due to Genea's remaining allegations of infringement on GENEA's IP.

**WHEREFORE**, Plaintiff pray for judgment against Defendants, and each of them, as follows:  For a declaration that Genea's failure to withdraw its C&D Letter is wrongful.  For such other and further relief as the court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

- For compensatory damages as allowed by law;
- For punitive damages allowed by law;
- For restitution and/or disgorgement;
- That Genea be ordered to pay all costs and expenses associated with this action;
- That Genea be ordered to pay the attorneys' fees reasonably incurred by the Plaintiffs;
- That Genea be made pay damages to Plaintiff for conversion of their WSA platform valued at its highest fair market value;
- That Genea be made to pay damages for trespassing on Plaintiff's WSA systems under Plaintiff's control and business;
- That Genea be made pay damages to Plaintiff according to unjust enrichment and quantum meruit, in an amount according to proof;
- That a constructive trust be imposed on Genea for its ill-gotten gains;
- That Genea be made pay damages to Plaintiff for lost present and future business due to intentional and negligent interference with economic relations with third parties, in a sum according to proof;
- That Genea be made pay restitution for ill-gotten gains in a sum according to proof;
- That this is an exceptional case in favor of Plaintiffs and awarding attorneys' fees pursuant to 35 **U.S.C.** Section 285; and

- That additional orders and other relief be granted as the Court deems just and proper.

## **<u>DEMAND FOR JURY TRIAL</u>**

Plaintiffs hereby request a jury trial on any and all claims triable by a jury.

Dated this January 8, 2016

By:

___/s/gregoryrichardsonesq____

Gregory Richardson, Esq.

LAW OFFICES OF GREGORY RICHARDSON